SAYDELL, Appellant,

v.

GEPPETTO'S PIZZA AND RIBS FRANCHISE SYSTEMS, INC. et al., Appellees.

[Cite as *Saydell v. Geppetto's Pizza & Ribs Franchise
Sys., Inc.* (1994), 100 Ohio App.3d 111.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 66326.

Decided Dec. 12, 1994.

112

*Timothy N. Toma,* for appellant.

*John J. Ricotta,* for appellees.

KRUPANSKY, Judge.

Plaintiff-appellant Gregg Saydell ("Saydell") timely appeals from two judgments of the Cuyahoga County Common Pleas Court. On July 29, 1992, following a trial, the trial court entered judgment in favor of defendant-appellee Geppetto's Pizza & Ribs Franchise Systems, Inc. ("Geppetto's"). The trial court specifically found that (1) Saydell and Geppetto's mutually agreed on a site upon which Saydell would establish his own Geppetto's franchise outlet; and (2) Saydell waived his right to a refund of the franchise fee he paid Geppetto's by failing to demand, on September 21, 1989, a refund of his franchise fee. Saydell's first two assignments of error request a review of the foregoing findings based upon the trial.

In addition, on July 14, 1992, the trial court granted summary judgment in favor of Geppetto's with respect to Saydell's claims which follow: (1) Geppetto's converted Saydell's franchise fee; (2) Geppetto's misappropriated a site upon which Saydell desired to establish his franchise outlet; and (3) Geppetto's was in violation of the Ohio Business Opportunity Plans statutes. Saydell's third, fourth and fifth assignments of error request a review of the foregoing issues determined by summary judgment.

In the spring of 1988, Saydell became interested in acquiring a Geppetto's franchise. He thereafter contacted F.D.C. Franchise Systems ("F.D.C."), which was joined as a third-party defendant in the case *sub judice* by Geppetto's but voluntarily dismissed following the July 29, 1992 judgment against Saydell. Saydell secured from F.D.C. a *prospectus* which indicated that an initial investment of from $100,980 to $144,360 would be required in order to commence operation of a Geppetto's franchise outlet. Saydell then applied to purchase a Geppetto's franchise and sought approval of his franchise application from Michael O'Malley ("O'Malley"), the president of Geppetto's.

On September 21, 1988, Saydell and Geppetto's executed a written franchise agreement. At that time, Saydell paid Geppetto's a franchise fee of $15,000 in consideration for the franchise agreement. Pursuant to the franchise agreement, Section 1.4, Article I, the franchise fee was non-refundable. However, Saydell and Geppetto's also executed Addendum No. One, a written attachment to the franchise agreement, which modified Section 1.4, Article I and stated in relevant part as follows:

"It is further understood and agreed that performance of the terms and conditions of this Franchise Agreement shall be contingent upon Franchisor's and Franchisee's mutual agreement on the location of the franchised business contemplated under this Franchise Agreement. Should a mutually agreeable site not be obtained on or before September 21, 1989, Franchisor agrees to return to

Franchisee the full Initial Franchise Fee. All other terms, conditions and covenants of the aforementioned Franchise Agreement shall remain unchanged and in force as written."

Addendum No. One was executed in accordance with Article XII and Article XV of the franchise agreement which required that any modification to the franchise agreement must be executed in writing. Article XII states in relevant part as follows:

"*Section 12.6—Modifications.* Franchisee may modify this Franchise Agreement only upon the execution of a written agreement between Franchisor and Franchisee. Franchisor may modify this Franchise Agreement only upon the execution of a written agreement between Franchisor and Franchisee. * * * "

Article XV states in relevant part as follows:

"*Section 15.4—Changes.* No change or modification of this Franchise Agreement shall be valid unless the same be in writing and signed by the parties hereto."

Saydell and Geppetto's eventually identified two sites upon which Saydell could have operated his franchise outlet. In the autumn of 1988, the same year the franchise agreement was signed, Saydell discovered a site at Learwood Square in Avon Lake, Ohio. Geppetto's, however, refused to permit Saydell to establish his franchise outlet at the Learwood Square site, claiming the site was not presently viable and would not be viable for at least two years.

In the following spring of 1989, Geppetto's proposed that Saydell establish his franchise outlet at a site in Broadview Heights, Ohio, which Geppetto's had recently leased. Geppetto's lease of the Broadview Heights site was expressly conditioned upon Geppetto's executing a sublease of the site with a franchisee. The Broadview Heights site, however, had not as yet been constructed and a house was present on the site which would have to be demolished before the site could support a franchise outlet.

Nevertheless, Saydell proceeded to investigate the feasibility of establishing his franchise outlet at the unconstructed Broadview Heights site. On March 21, 1989, Saydell obtained a demographics report on the Broadview Heights site. He then met with the landlord of the Broadview Heights site on a number of occasions both prior to and subsequent to September 21, 1989. On these occasions, Saydell and the landlord discussed the anticipated date on which the Broadview Heights site would be available to support a franchise outlet.

In the summer of 1989, however, unknown to Saydell, O'Malley and his personal friend Eric Marquardt proceeded to establish Marquardt's Geppetto's franchise outlet at the same Avon Lake site which O'Malley previously refused to Saydell. Thereafter, in December 1989 or January 1990, Saydell discussed the

construction of his franchise outlet on the Broadview Heights site with an architect employed by O'Malley and also discussed the equipment needs of his franchise outlet with a representative from an equipment leasing company. In January 1990, Saydell met with O'Malley and others to discuss the layout of the franchise outlet.

However, also in January 1990, O'Malley informed Saydell that the initial investment required to establish the Broadview Heights franchise outlet would exceed $200,000 rather than comport with the original figures provided in the *prospectus, i.e.,* $100,980 to $144,360. In February 1990, Saydell attempted to secure financing in order to acquire the additional funds he only then learned were required to establish the Broadview Heights franchise outlet.

When Saydell was unable to acquire the additional funds, he informed O'Malley that he would not be able to locate his franchise outlet upon the Broadview Heights site. It is significant that Saydell and Geppetto's executed *no written* document, in conformity with Article XII, *supra,* and Article XV, *supra,* agreeing that the Broadview Heights site was *obtained for construction* of Saydell's franchise outlet, *i.e.,* evidencing that Saydell and Geppetto's obtained a mutually *agreeable site in accordance with Addendum No. One, supra.*

Thereafter, Saydell, still intending to establish a Geppetto's franchise outlet, began to seek another site. In the summer of 1990, Saydell placed a bid on the Geppetto's franchise outlet in Elyria, Ohio. However, negotiations for obtaining the Elyria franchise outlet were unsuccessful. In June 1990, Saydell requested from O'Malley a refund of Saydell's $15,000 franchise fee.

Geppetto's refused to refund Saydell's franchise fee and Saydell commenced an action for breach of contract seeking return of the franchise fee. Thereafter, Saydell amended his complaint adding claims for (1) the wrongful misappropriation of the Avon Lake site by O'Malley and Eric Marquardt; (2) the misrepresentation of the initial investment costs and other failures by Geppetto's to comply with the Ohio Business Opportunity Plans statutes; (3) the failure of Geppetto's to comply with Federal Trade Commission requirements; and (4) the conversion by Geppetto's of Saydell's franchise fee.

On May 15, 1992, Geppetto's filed a motion for summary judgment arguing, *inter alia,* as follows: (1) Saydell, and not Geppetto's, actually breached the franchise agreement; (2) Saydell possessed no legal interest in the Avon Lake site and, therefore, Geppetto's appropriation of the site was not an illegal act; and (3) Geppetto's was exempt from compliance with the Ohio Business Opportunity Plans statutes since Geppetto's was in total compliance with Federal Trade Commission guidelines.

The crux of Geppetto's claims was that Saydell agreed to establish his franchise outlet upon the Broadview Heights site but subsequently refused to do so when Saydell failed to secure the initial investment which required funds in the amount of at least $100,980. Geppetto's attached to its summary judgment motion, *inter alia*, a copy of the January 7, 1987 *prospectus* which Geppetto's provided to Saydell in the spring of 1988, marked Exhibit D, and a copy of its franchise agreement with Saydell, marked Exhibit A.

Saydell then filed a brief in opposition to Geppetto's summary judgment motion arguing, *inter alia*, as follows: (1) since Saydell and Geppetto's failed to execute a written sublease of the Broadview Heights site, pursuant to R.C. 1335.05, there was no writing evidencing the parties obtained a mutually agreeable site in accordance with Addendum No. One, *supra*; (2) Geppetto's breached a fiduciary duty owing to Saydell when it misappropriated the Avon Lake site; and (3) Geppetto's was not in compliance with Federal Trade Commission requirements to provide accurate, clear and concise disclosure of the initial investment which was required to be paid by Saydell to Geppetto's. Saydell attached to his opposition brief, *inter alia*, a copy of Geppetto's lease agreement for the Broadview Heights site, which was contingent upon Geppetto's assigning the lease to an "owner/operator" by June 1, 1989.

Thereafter, the trial court granted summary judgment in favor of Geppetto's on all of Saydell's claims except for Saydell's complaint in contract for refund of the franchise fee. The contract action then proceeded to trial before the court after which the trial court found in favor of Geppetto's on the contract action. On August 21, 1992, the trial court journalized findings of fact and conclusions of law essentially holding as follows: (1) the parties obtained a mutually agreeable site, *viz.*, the Broadview Heights site; and (2) Saydell waived his right to a refund of the franchise fee since he did not request the refund by September 21, 1989 pursuant to Addendum No. One, *supra*. The within appeal was then timely filed.

Appellant's first two assignments of error, which were decided after trial, both concern the trial court's findings of fact and conclusions of law and, therefore, shall be considered together and follow:

"I. The trial court erred in finding that the parties agreed on the Broadview Heights location without a signed sublease.

"II. The trial court erred in finding that Saydell waived his right to demand the return of his $15,000 franchise fee."

These assignments have merit.

The interpretation of a written contract is a matter of law. Courts presume the parties expressed their respective intentions in the language they chose to employ in the contract. The language of a contract will be given its

ordinary meaning unless manifest absurdity results or the overall contents of the contract provide evidence that some other meaning was intended. Where a contract is clear and unambiguous, the court must give effect to the express terms when determining the rights and obligations of the parties. *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499.

In the case *sub judice*, Addendum No. One states in relevant part as follows:

"It is further understood and agreed that performance of the terms and conditions of *this Franchise Agreement shall be contingent upon Franchisor's and Franchisee's mutual agreement on the location* of the franchised business contemplated under this Franchise Agreement. *Should a mutually agreeable site not be obtained on or before September 21, 1989, Franchisor agrees to return to Franchisee the full Initial Franchise Fee. All other terms, conditions and covenants of the aforementioned Franchise Agreement shall remain unchanged and in force as written.*" (Emphasis added.)

An analysis of the clear and unambiguous language of Addendum No. One, *supra*, when the language is given its ordinary meaning, reveals that the provision under which Geppetto's was obligated to return Saydell's franchise fee was self-executing. Addendum No. One, *supra*, contains no provision requiring Saydell to make a demand for the refund of his franchise fee. *Shifrin, supra*. In simple terms, the language of Addendum No. One, *supra*, states that if by September 21, 1989, Saydell and Geppetto's did not obtain a mutually agreeable site upon which Saydell would construct his franchise' outlet, Geppetto's was obligated to tender the franchise fee to Saydell regardless of whether or not Saydell requested a return of the franchise fee.

The issue in appellant's first assignment of error, thus, becomes whether or not a "mutually agreeable site" was, in fact, "obtained." Neither appellant nor appellees disputed the fact that a written document was never executed with respect to obtaining a site for Saydell's franchise outlet. However, Geppetto's predictably argued that when Saydell obtained a demographic report on the site and, thereafter, engaged in preliminary negotiations with O'Malley, the landlord of the Broadview Heights site, an architect and an equipment lessor, Saydell impliedly agreed to locate his Geppetto's outlet upon the Broadview Heights site.

In contrast, Saydell predictably claimed he never agreed to establish his franchise outlet upon the Broadview Heights site. In addition, Saydell argued he never executed a lease of the Broadview Heights site and, therefore, the parties failed to obtain a mutually agreeable site. Although the parties in the case *sub judice* were not required to execute a written lease in order to obtain a mutually agreeable site, Geppetto's foregoing argument is flawed.

The final clause of Addendum No. One, *supra,* clearly states that Addendum No. One, *supra,* did not alter any terms of the franchise agreement other than those terms expressly addressed in Addendum No. One, *supra.* Therefore, the terms of Article XII, *supra,* and Article XV, *supra,* were not altered by Addendum No. One, *supra.* Pursuant to Section 12.6, Article XII, *supra,* and Section 15.4, Article XV, *supra,* any modification of the franchise agreement was required to be in writing.

In Article I, the franchise agreement states, with respect to the site of Saydell's franchise outlet, in relevant part as follows:

"*Section 1.1—Appointment.* Franchisor grants to Franchisee and Franchisee accepts, the following right, franchise and license:

"(a) To establish and operate one (1) Geppetto's Pizza & Ribs franchised restaurant at:

"TO BE DETERMINED ..."

█ It follows from Section 1.1, Article I, *supra,* which is a provision of the franchise agreement, that once Geppetto's and Saydell obtained a mutually agreeable site upon which Saydell would construct his franchise outlet, such obtaining of a mutually agreeable site would constitute a modification of Section 1.1, Article I of the franchise agreement. In accordance with Section 12.6, Article XII, *supra,* and Section 15.4, Article XV, *supra,* any modification of Section 1.1, Article I, *supra, i.e.,* any modification to the franchise agreement with respect to the site of Saydell's franchise outlet, would not be enforceable unless it was executed by both parties in writing. Specifically, although Saydell and Geppetto's were not required to execute a written lease in order to obtain a mutually agreeable site, the parties were required to execute a written document, *e.g.,* an "agreement to agree" evidencing that they obtained a mutually agreeable site. A sublease signed by both parties would surely be one form to evidence mutual agreement, however, not the only form.

In addition, R.C. 1335.05, the Ohio Statute of Frauds, requires parties to a contract, the subject of which is an interest in lands, to execute such contract in writing and states in relevant part as follows:

"No action shall be brought whereby to charge * * * a person * * * *upon a contract* or sale of *lands,* tenements, or hereditaments, *or interest in or concerning them* * * * unless the agreement upon which such action is brought * * * is in writing and signed by the party to be charged therewith. * * *" (Emphasis added.)

In the case *sub judice,* clearly the obtaining of a mutually agreeable site for Saydell's franchise outlet involved the formation of a contract the subject of which

was a property interest in land. While the parties were not required to execute a lease in order to obtain a mutually agreeable site, the parties were required, pursuant to R.C. 1335.05, to execute a written contract evidencing their agreement with respect to the property interest in land, *i.e.*, with respect to their mutually agreed interest in the Broadview Heights site.

Ohio appellate courts, however, will permit an agreement to be removed from operation of the Statutes of Frauds but only by virtue of either of the following: (1) partial performance; and (2) the doctrine of promissory estoppel. *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 622 N.E.2d 1093; *Weishaar v. Strimbu* (1991), 76 Ohio App.3d 276, 601 N.E.2d 587.

An agreement is removable from operation of the Statutes of Frauds by virtue of partial performance only where the party relying on the agreement changes his position to his detriment thereby making it impractical or impossible to return the parties to their original status. *Weishaar, supra.* An agreement is removable from operation of the Statutes of Frauds by virtue of the doctrine of promissory estoppel only when there has been a misrepresentation of compliance with the Statutes of Frauds or a promise to make a writing of an oral agreement. *McCarthy, supra.*

In the case *sub judice*, Geppetto's made no claim at trial, nor can it be ascertained from the record in the appeal *sub judice*, that Geppetto's changed its position in detrimental reliance upon Saydell's alleged partial performance of an agreement obtaining the Broadview Heights site thereby making it impractical or impossible to return Geppetto's or Saydell to their original status. *Weishaar, supra.*

At trial, Geppetto's and Saydell disputed whether or not construction on the Broadview Heights site was commenced in August 1989. However, the instant record contains no evidence that the developer or Geppetto's began construction on the Broadview Heights site in detrimental reliance upon Saydell's alleged partial performance of an agreement evidencing the parties obtained a mutually agreeable site, *viz.*, the Broadview Heights site.

It is undisputed Saydell neither took possession of the Broadview Heights site nor paid any rent to Geppetto's. In addition, it was undisputed that Geppetto's eventually avoided its lease of the Broadview Heights site and suffered no financial loss with respect to its lease of the Broadview Heights site. Thus, based upon the foregoing analysis, any parol contract between Saydell and Geppetto's by which the parties purported to have obtained a mutually agreeable site was not removable from the Statutes of Frauds by virtue of partial performance. *Weishaar, supra.*

■ Geppetto's also made no claim at trial, nor can it be ascertained from the record in the appeal *sub judice,* that Saydell misrepresented compliance with the Statutes of Frauds to Geppetto's or orally entered into a contract promising to obtain the Broadview Heights site in satisfaction of Addendum No. One, *supra,* and, thereafter, reduce the promise to writing. Thus, based upon the foregoing analysis, any parol contract between Saydell and Geppetto's by which the parties purported to have obtained a mutually agreeable site was not removable from the Statutes of Frauds based upon the doctrine of promissory estoppel. *McCarthy, supra.*

In the case *sub judice,* it is undisputed Saydell and Geppetto's failed to execute a writing evidencing that the parties obtained a mutually agreeable site upon which Saydell would construct his franchise outlet. In accordance with the terms of the franchise agreement, *viz.,* Article XII, *supra,* and Article XV, *supra,* and in accordance with R.C. 1335.05, any parol agreement entered into by Saydell and Geppetto's was unenforceable. It cannot be said, therefore, that the parties in the case *sub judice* obtained a mutually agreeable site upon which Saydell would construct his franchise outlet.

■ In addition, there was never a meeting of the minds between Saydell and Geppetto's. Prior to September 21, 1989, the date upon which the self-executing Addendum No. One, *supra,* would require Geppetto's to tender to Saydell a refund of his franchise fee, Saydell obtained only a demographics report of the Broadview Heights site and, on a few occasions, met with the landlord of the site to discuss when the house which was present on the site would be demolished.

Clearly, these acts on the part of Saydell comprised a sound business investigation and did not constitute an acceptance of the Broadview Heights site. Therefore, the foregoing acts did not manifest the obtaining of a mutually agreeable site upon which to construct Saydell's franchise outlet.

■ Since the parties failed to obtain a mutually agreeable site, it thus follows that, pursuant to the self-executing clause of Addendum No. One, *supra,* Geppetto's was required, on September 21, 1989, to tender to Saydell a refund of his franchise fee. Geppetto's, however, not only failed to tender the franchise fee to Saydell on September 21, 1989 but also refused, in the summer of 1990, to refund Saydell's franchise fee when Saydell finally did request a refund of the franchise fee. Nevertheless, the trial court found that Saydell waived his right to a refund of his franchise fee when he failed to request the refund on or by September 21, 1989, and Saydell appeals from this holding in his second assignment of error.

The law of waiver was set forth in *White Co. v. Canton Transp. Co.* (1936), 131 Ohio St. 190, 5 O.O. 548, 2 N.E.2d 501, and has remained constant. In *White,*

*supra,* at 198–199, 5 O.O. at 551, 2 N.E.2d at 505, the Supreme Court stated in relevant part as follows:

"A waiver is a *voluntary relinquishment of a known right.* It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform. *Mere silence will not amount to waiver where one is not bound to speak.* * * *

"It was up to the defendant to assume and carry the burden of proving the waiver by the greater weight of the evidence, but in so doing he was required to prove a *clear, unequivocal, decisive act* of the party against whom the waiver was asserted, *showing such a purpose or acts amounting to an estoppel on the latter's part.*" (Emphasis added.)

In the case *sub judice,* there is no evidence that Saydell expressly, by conduct or *via* silence, waived his right to a refund of the franchise fee. Although Saydell failed to request a refund of the franchise fee on September 21, 1989, it cannot be said that his failure to request a refund constituted a clear, unequivocal and decisive act on the part of Saydell amounting to a waiver of his right to a refund of the franchise fee. *White, supra.* As determined *supra,* the refund clause contained in Addendum No. One, *supra,* was self-executing. Saydell was not bound by the franchise agreement to demand a refund of the franchise fee. *White, supra.*

In addition, although Saydell continued after September 21, 1989 to search for a site upon which to establish his franchise outlet, it cannot be said that this act amounted to a clear, unequivocal and decisive waiver on the part of Saydell of his right to a refund of the franchise fee. *White, supra.* On the contrary, it was reasonable for Saydell who had purchased a franchise agreement in good faith for the sum of $15,000 to continue to search after September 21, 1989 for a suitable site upon which to establish his franchise outlet.

The fact that Saydell continued to honor the terms of the franchise agreement, in the spring of 1990, even after he was unable to secure the Broadview Heights site strongly suggests that Saydell intended all along to comply with the franchise agreement and establish his franchise outlet. In simple language, when Saydell continued to honor the terms of the franchise agreement in the spring of 1990, he demonstrated his "good faith."

It was not until June 1990, nearly two years after Saydell originally acquired the franchise agreement, that he finally realized he was not going to be able to realize his goal, for whatever reason, to establish a Geppetto's franchise outlet. At this point, Saydell requested the refund of his franchise fee when it was not

forthcoming within a reasonable time from O'Malley in accordance with Addendum No. One, *supra.*

Even if Saydell's actions constituted a waiver, which they did not, it can be said that Saydell waived only his right to recover his franchise fee *on September 21, 1989, i.e.,* Saydell may have waived the date itself but did not entirely waive his right to eventually recover the fee. As noted *supra,* the franchise agreement stated that a mutually agreeable site was to be obtained by September 21, 1989 and, following this date if no site was obtained, Geppetto's would return the franchise fee.

It is altogether significant that nothing in the franchise agreement required Saydell to demand his refund on September 21, 1989 or forfeit it. In simple terms, Addendum No. One, *supra,* was self-executing. However, there is no evidence that Geppetto's, on or about September 21, 1989, offered to refund Saydell's franchise fee as Geppetto's was clearly required to do by Addendum Number One, *supra.*

Based upon the foregoing analyses, the trial court twice erred when it held (1) Geppetto's was not required, pursuant to Addendum Number One, *supra,* to refund Saydell's franchise fee; and (2) Saydell waived his right to a refund of his franchise fee when he failed to demand the refund by September 21, 1989.

Appellant's first and second assignments of error, therefore, have merit and are sustained.

Appellant's third, fourth and fifth assignments of error appeal the trial court's partial grant of summary judgment to Geppetto's. Civ.R. 56(C) specifically provides that before summary judgment may be granted, the court must determine the following: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to only one conclusion viewing such evidence most strongly in favor of the nonmovant and the conclusion is adverse to that party. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 587 N.E.2d 825.

In addition, a motion for summary judgment forces the nonmoving party to produce timely filed evidence on issues for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095 (syllabus). The nonmovant must also present specific facts and may not rely merely upon the pleadings or upon unsupported allegations. *Shaw v. J. Pollock & Co.* (1992), 82 Ohio App.3d 656, 612 N.E.2d 1295.

Appellant's third assignment of error decided by summary judgment follows:

"III. The trial court erred in finding that Geppetto's indisputably did not convert Saydell's funds, as a matter of law."

This assignment has merit.

 Conversion is an unauthorized act of control or exercise of dominion by one party over the personal property of a second party which deprives the second party of possession of said property in denial of, or under a claim inconsistent with, the rights of the second party. *Taylor v. First Natl. Bank of Cincinnati* (1986), 31 Ohio App.3d 49, 31 OBR 88, 508 N.E.2d 1006; *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.* (1985), 24 Ohio App.3d 91, 24 OBR 160, 493 N.E.2d 289. In a conversion action, a demand and refusal are usually required to prove the conversion of property otherwise lawfully held. However, even though the original taking was lawful, should an act of dominion or control inconsistent with the plaintiff's ownership occur, a demand and refusal are not necessarily required. *Hadler, supra.*

 In the case *sub judice*, Geppetto's argued in its summary judgment motion that Saydell's claim for conversion must fail since Saydell himself breached the franchise agreement by failing to raise the initial investment of at least $100,980 despite the fact that the initial investment was originally misstated and subsequently increased by Geppetto's. Saydell, however, argued in his opposition brief that since no mutually acceptable site was obtained by September 21, 1989, Saydell was entitled pursuant to Addendum No. One, *supra*, to a refund of his franchise fee. The trial court granted summary judgment to Geppetto's with respect to this conversion action.

It is first noted that Geppetto's claim Saydell lacked the financial ability to establish his franchise outlet which resulted in Saydell's breach of the franchise agreement, in the spring of 1990, was not conclusively established at trial and remains an unresolved issue of fact. The issue of whether or not Saydell breached the franchise agreement in the spring of 1990, however, was irrelevant to the resolution of the conversion claim.

As determined *supra*, the plain language of Addendum Number One, *supra*, clearly provided that Geppetto's would return Saydell's franchise fee if a mutually agreeable site was not obtained by September 21, 1989. Since a mutually agreeable site was not obtained, *i.e.*, since the parties failed to execute a written document evidencing they obtained a mutually agreeable site, *viz.*, the Broadview Heights site, by September 21, 1989, Saydell was entitled to receive a refund of his franchise fee as of September 21, 1989.

When Geppetto's failed to tender the franchise fee to Saydell on September 21, 1989, Geppetto's breached the franchise agreement thereby relieving Saydell of all his obligations under the franchise agreement. As noted *supra*, the fact that

Saydell and Geppetto's continued to negotiate to establish Saydell's franchise outlet did not constitute a waiver by Saydell of his right to recover his franchise fee.

Thus, it is evident that Saydell, as a matter of law, could not have breached the franchise agreement in the spring of 1990, *i.e.,* whether or not Saydell, in the spring of 1990, was able to secure sufficient funds for the initial franchise investment was irrelevant since the franchise agreement was effectively terminated on September 21, 1989 when Geppetto's failed to tender the franchise fee to Saydell.

Based upon the foregoing analysis, it is obvious that, although no genuine issue of material fact remained to be litigated, Geppetto's was not entitled to summary judgment as a matter of law. *Osborne, supra.* At trial, Saydell met the burden articulated in *Wing, supra,* and *Shaw, supra,* when he presented evidence demonstrating that (1) Geppetto's failed to tender or refund his $15,000 franchise fee on September 21, 1989 in accordance with the signed, self-executing Addendum No. One, *supra;* and, (2) Geppetto's, in the summer of 1990, refused to refund his $15,000 franchise fee upon his express request for its refund. The trial court, thus, erred when it granted summary judgment to Geppetto's on the conversion claim.

The first conversion took place on September 21, 1989 when Geppetto's failed to tender the $15,000 franchise fee in accordance with the self-executing Addendum No. One, *supra.* The second conversion, which continues, took place when Saydell made a demand on Geppetto's for the return of the $15,000 franchise fee. *Taylor, supra; Hadler, supra.*

Appellant's third assignment of error has merit and, therefore, is sustained.

Appellant's fifth assignment of error decided on summary judgment shall be considered next in logical order and follows:

"V. The trial court erred in finding that Geppetto's indisputably did not violate the Ohio Business Opportunities laws by failing to make complete and accurate disclosures."

This assignment has merit.

■ R.C. 1334.01 *et seq.* comprise the Ohio Business Opportunity Plans statutes. R.C. 1334.01(D)[1] defines a "business opportunity plan."

---

1. R.C. 1334.01(D) states in relevant part as follows:

" 'Business opportunity plan' means an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all of the following conditions: (1) The goods or services are supplied by the seller * * * (2) The purchaser is required to make an *initial* payment greater than five hundred dollars, but less than fifty thousand dollars, to the seller

R.C. 1334.03[2] articulates the practices and representations which are prohibited by the Ohio Business Opportunity Plans statutes. R.C. 1334.06[3] defines the required contents of business opportunity plan agreements. Pursuant to R.C. 1334.01(D), the franchise agreement between Saydell and Geppetto's was governed by the Ohio Business Opportunity Plans statutes.

R.C. 1334.13, however, exempts certain transactions from the Ohio Business Opportunity Plans statutes and states in relevant part as follows:

"[S]ections 1334.01 to 1334.15 of the Revised Code do not apply to:

"(A) Any transaction that fully complies with the trade regulation rule of the federal trade commission, 'disclosure requirements and prohibitions concerning franchising and business opportunity ventures,' 16 C.F.R. 436.1 et seq. * * * "

In its summary judgment motion, Geppetto's argued that Saydell's claims premised upon the Ohio Business Opportunity Plans statutes must fail since Geppetto's was in full compliance with the standards set forth by the Federal Trade Commission in Section 436.1 et seq., Title 16, C.F.R. Saydell argued in his opposition brief, however, that since Geppetto's *prospectus* was not in compliance with federal guidelines, Geppetto's was not exempt from the Ohio Business Opportunity Plans statutes. The only issue in this fifth assignment of error, therefore, becomes whether or not Geppetto's was in full compliance with the foregoing federal regulations. If so, summary judgment in favor of Geppetto's was appropriate on Saydell's claim which was predicated upon the Ohio Business Opportunity Plans statutes.

Section 436.1, Title 16, C.F.R. states in relevant part as follows:

"[I]t is an unfair or deceptive act or practice * * * for any franchisor or franchise broker:

* * * (3) The seller makes any of the following representations: * * * (b) That the purchaser will be provided * * * assistance in finding locations * * * for use in the sale * * * of the goods or services. * * * " (Emphasis added.)
It is noted that Saydell's initial payment to Geppetto's was in the amount of $15,000.

2. R.C. 1334.03 states in relevant part as follows: "In connection with the sale or lease of a business opportunity plan, no seller or broker shall * * * (B) Make any false or misleading statement or engage in any deceptive or unconscionable act or practice * * *."

3. R.C. 1334.06 states in relevant part as follows: "(A) Every agreement selling or leasing a business opportunity plan shall be in writing. * * * The agreement shall contain at least the following: * * * (7) Notice of the purchaser's right to cancel the agreement in at least ten-point boldface type * * * (B) A completed form, in duplicate, captioned 'notice of cancellation,' shall be attached to the agreement. * * * (E) In connection with the sale or lease of a business opportunity plan, no seller shall: * * * (3) Fail to inform each purchaser orally, at the time an agreement is signed, of the right to cancel. * * * "

"(a) To fail to furnish any prospective franchisee with the following information accurately, clearly, and concisely stated, in a legible, written document * * *

" * * *

"(7) A statement of the total funds which must be paid by the franchisee to the franchisor * * * in order to obtain or commence the franchise operation * * *

" * * *

"(20)(i) A balance sheet (statement of financial position) for the franchisor for the most recent fiscal year, and an income statement (statement of results of operations) and statement of changes in financial position for the franchisor for the most recent 3 fiscal years * * *

"(21) All of the foregoing information in paragraph (a)(1) through (20) of this section shall be contained in a single disclosure statement or prospectus * * *."

In the case *sub judice*, Geppetto's offered Exhibit D attached to its summary judgment motion, *viz.*, the *prospectus* Geppetto's provided to Saydell, as evidence of compliance with the foregoing federal regulations. An examination of Defendant's Exhibit D, however, reveals that Geppetto's *prospectus* failed to accurately state the initial investment which Saydell was required to pay to Geppetto's in order to commence operation of his franchise outlet.

Geppetto's *prospectus* stated that Saydell's initial investment would be between $100,980 and $144,360 when, in reality, Saydell later learned his initial investment would exceed $200,000. Thus, Geppetto's failed to provide to Saydell an accurate statement of the total funds which Saydell was required to pay to Geppetto's in order to obtain or commence his franchise operation. Section 436.1(a)(7), Title 16, C.F.R., *supra*.

However, Geppetto's argued in its reply brief to Saydell's opposition brief that the initial investment which Saydell was told he would have to pay to Geppetto's, *viz.*, $100,980 to $144,360, was valid as of the summer of 1988 when Saydell and Geppetto's were negotiating for sale of the franchise. The *prospectus*, however, carries the effective date January 7, 1987, *i.e.*, a date effective more than one and one-half years prior to the date of the within franchise negotiations.

It is, thus, difficult to believe Geppetto's argument that its statement to Saydell of the initial investment constituted an accurate statement, in the summer of 1988, of the total funds required to commence and operate Saydell's franchise outlet. Section 436.1(a)(7), Title 16, C.F.R. In any event, whether or not Geppetto's representation to Saydell with respect to the initial investment was accurate in accordance with Section 436.1(a)(7), Title 16, C.F.R., *supra*, the question itself constituted a genuine issue of material fact remaining to be litigated.

In addition, an examination of defendant's Exhibit D reveals that Geppetto's *prospectus* failed to contain a balance sheet (statement of financial position) for Geppetto's for the fiscal year most recent to the date Saydell received the *prospectus, viz.,* January 1987 through December 1987, and an income statement (statement of results of operations) and statement of changes in financial position for Geppetto's for the most recent two fiscal years prior to the date Saydell received the *prospectus, viz.,* January 1986 through December 1987. The absence of the foregoing financial statements in a *single prospectus* violated Section 436.1(a)(20)(i), Title 16, C.F.R., *supra*, and Section 436.1(a)(21), Title 16, C.F.R., *supra*.

Geppetto's argued in its reply brief, however, that it provided the foregoing financial statements which were marked Exhibit C and attached to its *prospectus.* Nevertheless, although Geppetto's *prospectus* states under section "21" that the financial statements are marked as Exhibit C and attached to the *prospectus,* Geppetto's *prospectus* does not contain an attachment labeled Exhibit C.

Geppetto's also argued in its reply brief that it provided the financial statements to Saydell as evidenced by Saydell's signature on the final page of the *prospectus* which constituted Saydell's acknowledgement of receipt. At best, however, Saydell's signature constituted mere evidence that Saydell received the financial statements. Saydell's signed acknowledgement, therefore, standing in contrast to the notable absence of any financial statements within the *prospectus* attached to Geppetto's summary judgment motion, created a genuine issue of material fact which remained to be litigated, *viz.,* whether or not Geppetto's provided the required financial statements in accordance with Section 436.1(a)(20)(i), Title 16, C.F.R., *supra.*

It is additionally significant, however, that Geppetto's also stated in its reply brief that it provided financial statements as of the effective date of the *prospectus, i.e.,* financial statements effective as of January 7, 1987. However, since Saydell received the *prospectus* in the spring of 1988, Geppetto's was required to attach to the *prospectus* a balance sheet (statement of financial position) for the year *ending* 1987 and an income statement (statement of results of operations) and statement of changes in financial position for the period *beginning in January 1986 and ending in December 1987.*

Thus, although Geppetto's possibly provided Saydell with an income statement and statement of changes for year 1986, Geppetto's could not have provided the balance sheet, income statement and statement of changes for the year ending 1987 since Geppetto's stated it provided financial statements effective as of January 7, 1987. Geppetto's own statements, thus, strongly suggest its failure to comply with Section 436.1(a)(20)(i), Title 16, C.F.R., *supra.*

Based upon the foregoing analyses, it is clear that at least two genuine issues of material fact remained to be litigated, *viz.*, (1) whether or not Geppetto's representation to Saydell of the initial investment was accurate; and (2) whether or not Geppetto's did indeed provide the required financial statements to Saydell in accordance with Section 436.1, Title 16, C.F.R. In addition, in light of the significantly inaccurate disclosure by Geppetto's to Saydell of the initial investment, which violated Section 436.1(A)(7), Title 16, C.F.R., it is obvious Geppetto's was not entitled to summary judgment as a matter of law. *Osborne, supra.*

At trial, Saydell met the burden articulated in *Wing, supra,* and *Shaw, supra,* when he presented evidence, in the form of Geppetto's *prospectus,* that Geppetto's failed to comply with the foregoing federal regulations. The trial court, thus, erred when it granted summary judgment to Geppetto's on the issue of whether Geppetto's was exempt from the requirements of Ohio's Business Opportunity Plans statutes.

Appellant's fifth assignment of error has merit and, therefore, is sustained.

Appellant's fourth assignment of error decided on summary judgment follows:

"IV. The trial court erred in finding that Geppetto's indisputably did not misappropriate the Avon Lake location found by Saydell, as a matter of law."

This assignment has merit.

In its summary judgment motion, Geppetto's argued that Saydell's misappropriation claim must fail since Saydell himself breached the franchise agreement and since Saydell possessed no legal interest in the Avon Lake site upon which to state a claim for relief. Saydell argued in his opposition brief, however, that a fiduciary relationship existed between Saydell and Geppetto's which Geppetto's breached when O'Malley acted as follows: (1) O'Malley falsely represented to Saydell that the Avon Lake site was not viable for a franchise outlet; and (2) approximately six months following his misrepresentation, O'Malley assisted his personal friend Eric Marquardt to establish a Geppetto's franchise outlet upon the same Avon Lake site. The trial court granted summary judgment to Geppetto's with respect to this misappropriation action.

▮ A fiduciary relationship does not exist between a franchisor and a franchisee in the absence of a statute expressly creating such fiduciary relationship or, in the alternative, absent an understanding, held by both parties to the subject agreement, that a special trust and confidence has been reposed by the franchisee in the franchisor. Accord *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075.

▮ In the case *sub judice*, the Ohio Revised Code contains no statute creating a fiduciary relationship between franchisee and franchisor. In addition,

there is no evidence in the record before this court that Saydell, O'Malley and/or Geppetto's mutually shared an understanding that Saydell reposed a special trust and confidence in O'Malley or Geppetto's. On the contrary, the relationship between Geppetto's, O'Malley and Saydell was that of buyer and seller. Therefore, neither Geppetto's nor O'Malley was under a duty to disclose information to Saydell by virtue of a fiduciary relationship.

 However, the Ohio Business Opportunity Plans statute, R.C. 1334.03, provides that no franchisor shall make any misleading or false statement or engage in any deceptive or unconscionable act with respect to the sale of a business opportunity plan.

In the case *sub judice*, it was undisputed that Saydell discovered the Avon Lake site in the autumn of 1988 and requested permission from O'Malley to establish his franchise outlet upon this site. In his brief in opposition to summary judgment, Saydell claimed O'Malley told Saydell in the fall of 1988 the Avon Lake site was not viable for his franchise outlet and would not become viable for two years.

As evidence of the foregoing misrepresentation by O'Malley, Saydell referenced, in his opposition brief, the deposition of Ken Musil. Although the Musil deposition was filed in the trial court when the court considered Geppetto's summary judgment motion, it is not contained in the record before this appellate court.

Nonetheless, the answer of third-party defendant F.D.C. Franchise Systems to Geppetto's third party complaint, which was filed with the trial court on September 19, 1991 and is contained in the record on appeal, stated in relevant part as follows:

"Defendant [Geppetto's] *unreasonably refused* to allow Plaintiff [Saydell] to operate a franchise on the Avon Lake site."

Furthermore, in Geppetto's appellate brief, neither Geppetto's nor O'Malley denies that O'Malley told Saydell in the fall of 1988 the Avon Lake Site was not viable for his franchise outlet and would not become viable for two years. On the contrary, Geppetto's argues on appeal only that its appropriation of the Avon Lake site breached no duty owing Saydell.

In addition, it was undisputed that O'Malley, in the summer of 1989, assisted Eric Marquardt, his personal friend, to establish Marquardt's Geppetto's franchise outlet upon the same Avon Lake site which was discovered by Saydell. In his answers to interrogatories, O'Malley admitted he awarded the Avon Lake site to Marquardt in the spring of 1990 so that Marquardt could construct his own franchise outlet upon the Avon Lake site.

Based upon the foregoing facts, it is obvious that O'Malley, by misrepresenting to Saydell the viability of the Avon Lake site and, thereafter, assisting his personal friend Eric Marquardt to establish Marquardt's franchise outlet upon the same Avon Lake site, breached the Ohio Business Opportunity Plans statute, R.C. 1334.03.

By misrepresenting to Saydell the viability of the Avon Lake site in the fall of 1988, O'Malley clearly breached his statutory duty to refrain from making any misleading or false statement. By assisting his personal friend Marquardt to establish Marquardt's franchise outlet upon the Avon Lake site, O'Malley clearly breached his statutory duty to refrain from engaging in any deceptive or unconscionable act with respect to Saydell's establishment of his franchise outlet.

Thus, it becomes clear that O'Malley, by failing to comply with the foregoing provision of the Ohio Business Opportunity Plans statutes, actually breached the franchise agreement in the fall of 1988 although Saydell was then unaware of O'Malley's breach. Based upon the foregoing analysis, it is obvious that, although no genuine issue of material fact remained to be litigated, Geppetto's was not entitled to summary judgment as a matter of law. *Osborne, supra.*

At trial, Saydell met the burden articulated in *Wing, supra,* and *Shaw, supra,* when he presented the foregoing evidence which demonstrated that (1) Saydell discovered the Avon Lake site and requested O'Malley's permission to establish his franchise outlet upon that site; (2) O'Malley misrepresented to Saydell the short-term and long-term viability of the Avon Lake site; and (3) despite the fact that Saydell continued to seek a site for his franchise outlet well into the year 1990, O'Malley assisted his personal friend, in the summer of 1989, to establish that personal friend's own franchise outlet upon the same Avon Lake site. The trial court, thus, erred when it granted summary judgment to Geppetto's on the misappropriation claim.

Appellant's fourth assignment of error has merit and, therefore, is sustained.

*Judgment reversed*
*and cause remanded.*

MATIA, J., concurs.

HARPER, J., concurs in judgment only.

HARPER, Judge, concurring in judgment only.

I agree with the majority that genuine issues were raised that would defeat summary judgment; however, I concur in judgment only because I disagree with the majority's analysis on most of the issues, particularly analysis on the refund of the franchise fees and the conversion arguments.

Appellant argues that the trial court erred by holding that there was a mutual agreement on location and, therefore, the provision of the franchise agreement concerning the forfeiture of the franchise fee was complied with.

The franchise agreement provides in a pertinent part as follows:

Section 1.4 of the contract states:

"In consideration of the franchise and license granted hereby, Franchisee shall pay, in one (1) lump sum, to Franchisor an initial franchise fee of Fifteen Thousand ($15,000.00) Dollars (herein called 'Initial Franchise Fee') upon the execution of this Franchise Agreement. It is expressly understood and agreed that the Initial Franchise Fee is and shall be fully earned by Franchisor upon the execution of this Franchise Agreement and that *no part of the Initial Franchise Fee shall be refunded or forgiven to Franchisee for any reason whatsoever.*" (Emphasis added.)

Addendum No. One of the agreement states:

"It is further understood and agreed that performance of the terms and conditions of this Franchise Agreement shall be contingent upon Franchisor's and Franchisee's mutual agreement on the location of the franchised business contemplated under this Franchise Agreement. Should a mutually agreeable site not be obtained on or before September 21, 1989, Franchisor agreed to return to Franchisee the full initial Franchise Fee.

"All other terms, conditions and covenants of the aforementioned Franchise Agreement shall remain unchanged and in force as written."

The main issue before the court is whether the agreement allows appellant the right to a refund after September 21, 1989, and if so, was there a mutual agreement on the Broadview Heights location to have negated the need for the refund? Both questions should be answered in the affirmative.

According to the agreement, appellant is to be refunded his franchise fees if no location is agreed upon on or before September 21, 1989. The issue, therefore, is whether a mutually agreeable site was obtained before September 21, 1989.

The franchise agreement places the responsibility for finding a location on appellant, the franchisee, subject to approval by appellee, the franchisor. There is no definition as to what constitutes a mutually agreeable site, so it is necessary to look to the totality of the conduct of the parties.

The record shows that appellant found the Broadview Heights location. He testified that he was interested in the location. He made inquiries and had several meetings with the landlord and they discussed costs. He informed appellee and also had several discussions with appellee on the location. Appellee never rejected the location but rather attempted to help appellant get financing.

Appellant met with the building architect and the equipment person and discussed layout and cost of equipment. He was given the store operating manual. He made arrangements for the leasing of equipment and attempted to secure financing for the equipment.

The record also shows that appellant continued in his attempt to secure financing for the Broadview Heights location way past the September 21, 1989 deadline for refund and never at any time did he demand a refund of the franchise fees. Therefore, from the totality of the parties' conduct and there being no evidence of disagreement on the location by appellee, a site of Broadview Heights was agreed upon by the parties. The agreement did not indicate that mutual agreement on a site requires a sublease agreement because the sublease contract is between the property owner and appellant, of which appellee had no control.

Appellant further argues that the trial court erred in holding that appellant waived his right to the refund.

Appellant testified that he liked the Broadview Heights location and attempted to acquire it. As stated above, he made all efforts to acquire it and made all the negotiations for the acquisition several months after the September 21, 1989 deadline. Appellant by his conduct waived his right to the refund because not only did he not seek a refund, but he continued after September 21, 1989 to attempt to acquire the location. Another inquiry is, why was appellant unable to acquire the Broadview location?

The following testimony was adduced during trial:

"Q. Why did you meet with Mike O'Malley?

"A. Because I wanted to tell him that I couldn't come up with the extra money that I need had [sic] in order to take him up on his offer to go into the Broadview Heights location.

"Q. Extra money, Greg on [sic]. Hang on. By early on in your examination, you knew that the [range] was anywhere from $100,000 and $144,000, correct?

"A. That was the range.

"Q. That was shown to you on a fact sheet by FDC, right?

"A. That's correct.

"Q. A fact sheet that was in the disclosure document?

"A. No.

"Q. It didn't matter if it was 185, $205,000 or three million dollars you couldn't even meet the bare minimum of $100,000, could you?

"A. I was told—

"Q. Could you—

"A. I was getting—

"Q. Could you, yes or no.

"THE COURT: He can answer the question.

"Q. Yes or no?

"A. No I could not get those kinds [of] funds.

"Q. So you meet with Mike O'Malley on 2–12 by your notation, right?

"A. That's correct.

"Q. And you tell Mike, I can't come up with the money. Right?

"A. I told Mike I couldn't come up with the extra money.

"Q. And yesterday, made a notation on your direct examination that you said, I told Mike I have to decline from the Broadview Heights location, do you remember saying that?

"A. Yes.

"Q. Those were your words?

"A. Yes, sir.

"Q. Am I right to assume that if you mean you decline, that you have already testified in your mind when you told him that statement?

"A. No, sir, I declined an offer to go into the location.

"Q. [sic] Because I had not accepted it yet.

"Q. Then what are you declining from?

"A. His offer.

"Q. Needless to say you at the time [told] him you don't have enough money and you are walk[ing] away from Broadview Heights, correct in essence?

"A. I am not walking away. Well—

"Q. You don't want it?

"A. I didn't want the location, that's correct.

"Q. And construction had started on it, hadn't it?

"A. Yes. That's correct.

"Q. And construction had started as to the types of plans that you and O'Malley had talked to with Lewandowski correct?

"A. That Mike had and I was there, that's right." (Language *sic*.)

Thus, from appellant's testimony, the reason he declined to acquire the Broadview Heights location was not because there was no mutual agreement on the site but because he could not finance the project. As the Ohio Supreme Court held in *Fletcher v. Fletcher* (1994), 68 Ohio St.3d 464, 468, 628 N.E.2d 1343, 1347:

"This court will not reweigh the evidence introduced in a trial court; rather, we will uphold the findings of the trial court when the record contains some competent evidence to sustain the trial court's conclusions. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 18 O.O.3d 414, 414 N.E.2d 426. In addition, we will indulge all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law. *In re Sublett* (1959), 169 Ohio St. 19, 7 O.O.2d 487, 157 N.E.2d 324. When a trial court, sitting without a jury, determines an issue but does not make separate findings of fact and conclusions of law, a reviewing court will presume the validity of that judgment as long as there is evidence in the record to support it. *Scovanner v. Toelke* (1928), 119 Ohio St. 256, 163 N.E. 493, paragraph four of the syllabus."

While it is my opinion that there was a mutual agreement on location, it is also an issue of fact whether appellant waived his right to seek a refund of the franchise fee when he continued to seek a franchise location with the approval of appellee after the September 21 deadline.

For these reasons, I concur in judgment only.