Joseph **GOMEZ**, et al., Plaintiffs,

v.

**HUNTINGTON TRUST CO., N.A., et al., Defendant.**

No. 3:98CV7436.

United States District Court, N.D. Ohio, Western Division.

Nov. 16, 2000.

Kevin J. Kenney, Charles D. Niehaus, Bischoff, Kenney, Drescher & Niehaus, Sylvania, OH, for plaintiff.

Walter A. Winslow, Barkan & Robon, Toledo, OH, for defendant.

Timothy D. Connors, Toledo, OH, Gregory Roether Elder, Barkan & Robon, Toledo, OH, for defendant and cross-defendant.

Kenneth C. Baker, Matthew D. Harper, Eastman & Smith, Toledo, OH, for defendant and cross-claimant.

Gregory Roether Elder, Marvin A. Robon, Barkan & Robon, Toledo, OH, Lisa Babish Forbes, Anthony J. O'Malley, Vorys, Sater, Seymour & Pease, Cleveland, OH, for defendant, cross-claimant and cross-defendant.

Richard M. Ashton, Katherine H. Wheatley, Washington, DC, Lawrence J. Kiroff, Office of U.S. Atty., Toledo, OH,

Robert K. Lang, Office of Atty. Gen., Columbus, OH, for intervenor.

## ORDER

CARR, District Judge.

This case involves a claim by plaintiffs that the defendant Huntington Trust Co. ("Huntington") breached an Escrow Agreement which protected plaintiffs' investment in an all-or-nothing stock offering by the defendant Towne Bank ("Towne"). Pending are plaintiffs' and Huntington's cross motions for summary judgment (Docs. 255 and 271). Because plaintiffs were third party beneficiaries of the Escrow Agreement and Huntington failed on several occasions to fulfill its obligations to the plaintiffs, their motion for summary judgment shall be granted in part and Huntington's motion shall be denied.

## FACTUAL BACKGROUND

Towne was incorporated under the laws of Ohio on April 1, 1992. By the end of 1992, the Ohio Division of Banks, the Federal Reserve Bank and the Federal Deposit Insurance Corporation had given their approval to open Towne. On April 28, 1992, Towne filed an S–1 Registration Statement and Prospectus with the Securities & Exchange Commission ("SEC"). The registration was deemed effective by the SEC as of July 9, 1992.

The promoters prepared financial projections which showed that Towne would need a minimum of $4 million to form and operate the bank. Towne elected to obtain these funds by selling its own securities in the form of Subscription Agreements for 320,000 shares at $12.50 per share.

Pending the successful sale of a minimum of 320,000 shares, the funds obtained from sales of the Subscription Agreements were to be held in an Escrow Account established by Towne with Huntington. After selling 320,000 shares, Towne, pursuant to the terms of the Escrow Agreement, would receive the funds from Huntington.

The Escrow Agreement stipulated that if 320,000 shares were not subscribed by December 31, 1992, the funds invested by the initial purchasers would be returned, with accumulated interest. The Escrow Agreement was a common device employed by start-up companies to encourage investors to subscribe to shares, while simultaneously protecting the investors in the event insufficient capital becomes available within a defined period of time.

On June 9, 1992, Towne and Huntington signed the Escrow Agreement, which, in pertinent part, provided:

The Escrow Agent shall act as Escrow Agent hereunder until the earlier to occur of:

(A) The sale of 320,000 shares; or

(B) December 31, 1992, provided, however that the Company may, by letter to the Escrow Agent, extend this Expiration Date by up to one hundred twenty (120) days (i.e., April 30, 1993).

Upon the occurrence of one of the foregoing two events, the Escrow Agent shall remit the balance of monies held in the Escrow Account by issuing its cashiers checks payable to the Company, or if the Company fails to accept subscription agreements representing the sale of at least 320,000 shares prior to the Expiration Date, then, the Escrow Agent shall return the Proceeds with interest for the time such Proceeds were held in escrow equal to the passbook savings rate from time to time in effect at Escrow Agent to each subscriber....

Towne began selling subscription agreements to investors on August, 1992. The plaintiffs purchased shares in Towne: Joseph Gomez, 2,000 shares in March, 1994; Read and Dorothy Backus, 2412 shares on May 26, 1993, October 27, 1993, October 28, 1994, and August, 1995; Anne Stahl Crowley, 516 shares in March 1994; and Daniel Whitacre and Linda Whitacre purchased 2,020 shares in December, 1994.

A fifty-two page Prospectus informed the plaintiffs, inter alia, of Huntington's role as Escrow Agent. In addition, the prospectus described the Escrow Agreement, including the retention of initial investments until the offering was fully subscribed, and the prompt return of funds if the subscription failed to meet its goal within the period specified in the Agreement.

Huntington was not involved in Towne's securities registration or solicitation process. Plaintiffs did not have any communication with Huntington before subscribing their shares. Plaintiffs' checks for their subscriptions were, however, made payable to "Huntington Trust Co NA, Escrow Agent for [Towne]."

The Subscription Agreement stated that the shares will be executed "in connection with the Company's offering of Shares described in its Prospectus." Later Subscription Agreements define the term Prospectus to also include "any amendments and supplements thereto." The Subscription Agreement also references Huntington's role as the Escrow Agent. Finally, the Agreement states that the plaintiffs "acknowledg[e] receipt" of a copy of the Prospectus.

On July 1, 1992, Towne and Huntington amended the Escrow Agreement to permit an extension of the date on which, in the event 320,000 shares had not been subscribed by December 31, 1992 (or by April 30, 1993, the extension date authorized in the original Escrow Agreement), the Agreement would terminate and the funds would be returned to investors. In the letter amending the Agreement, Huntington and Towne agreed that Towne could by letter to the Escrow Agent, extend the Expiration Date to June 30, 1993.

Contrary to the express terms of the Escrow Agreement, no letter extending the Expiration Date to April 30, 1993, was received by Huntington. Nor did Towne send a letter extending the date, per the amendment to the Escrow Agreement, to June 30, 1993.

As of December 31, 1992, Towne had subscribers for only 40,000 of the 320,000 share minimum. The 320,000 share mini-

mum likewise was not reached by April 30, 1993. Indeed, by June 30, 1993, the amended, though not formally invoked, Expiration Date, Towne had only sold 100,000 shares.

In light of this situation, Huntington and Towne agreed on June 30, 1993, to another amendment ("Second Amendment"). The Second Amendment extended the subscription period until December 31, 1993, and also permitted Towne "by letter to the Escrow Agent, [to] extend this expiration date to June 30, 1994."

The Second Amendment imposed additional duties on Huntington and Towne. Towne was to deliver to each existing subscriber a copy of the prospectus, a supplement to the prospectus, and an amended Subscription Agreement. Huntington was required to return individual subscribers' funds unless it obtained an amended Subscription Agreement from each pre-June 30, 1993 subscriber on or before August 31, 1993. If Huntington had not received an Amended Subscription from the investors, Huntington was obligated to return each subscriber's proceeds "promptly" on August 31, 1993.

Towne never mailed Subscription Agreements to any investor. Huntington acknowledges that it did not receive any Amended Subscription Agreements as required by the Second Amendment. None of the funds were returned to the subscribers.

Several months after the June 30, 1993, Second Amendment, Towne's counsel phoned Huntington, asking it to execute a certificate acknowledging that it had either received all of the required Amended Subscription Agreements or returned the funds to any original subscribers who had not executed Amended Subscription Agreement.

After receiving this phone call, Huntington took no further action to obtain any information about the Amended Subscription Agreements. Huntington asserts only that: "[Towne] never resolicited any of its pre-June 30, 1993 investors." Huntington never provided the certificate that had been requested in the phone call from Towne's counsel.

On July 1, 1993, Towne also wrote a Supplement to the Prospectus ("Prospectus Supplement"). Like the original Prospectus and Escrow Agreement, the Prospectus Supplement stated that the Escrow Agent will refund all funds if the minimum shares were not subscribed as of the Expiration Date. The Prospectus Supplement also provided that the Expiration Date of the offering had been extended to December 31, 1993, "with the maximum period of extension to June 30, 1994." In another section, the Prospectus Supplement stated that: "[t]he extended Expiration Date of December 31, 1993 may be extended at the discretion of the Company until not later than June 30, 1994". Finally, "[w]ritten notice of any such extension will be given to all persons who are already subscribers at the time of the extension . . ."

The Prospectus Supplement also provides information for previous investors, "an investor who has previously subscribed will be given an election to renew such Investor's subscription according to the amended escrow provisions or to have such investor's funds refunded." If a pre-June 30, 1993 investor "elect[ed] to extend" his investment, the Prospectus Supplement directed the investor to "complete, date and sign the Amended Subscription Agreement" and return it "immediately to the Company."

Huntington contends that "each [plaintiff] was given a Prospectus." Several plaintiffs purchased their subscriptions after July 1, 1993. Huntington does not allege, however, that plaintiffs actually received the Prospectus Supplement describing the extensions of the subscription period. Towne never updated its Prospectus after July 3, 1993, to incorporate subsequent changes. Towne failed to update the financial information contained in the offering materials after July 30, 1994. In addition, Towne never timely amended the

Articles of Incorporation to authorize any number of shares of the Company above the original 13,000 shares issued to the organizers of the Company.

Huntington's records reveal that $347,125 was returned to 55 subscribers requesting a refund between April 8, 1993 and June 28, 1995.

On August 14, 1995, Towne's applications to the Federal Reserve Bank ("FRB") to become a bank holding company and a member of the Federal Reserve System were approved. The approval was later extended until November 27, 1995, subject to compliance with certain approval conditions.

Mark Dunn was Huntington's trust officer for the Towne account. Once 320,000 shares had been subscribed, he was responsible for releasing the funds held in the Escrow Account. As of September 1, 1995, over $4,000,000 had accumulated in the Escrow Account. A portion of that amount was, however, from accumulated interest. Thus, although the amount of funds on hand had reached the $4,000,000 capitalization figure, fewer than the minimum 320,000 shares had been subscribed.

Mr. Dunn, however, mistakenly concluded that Towne had successfully secured subscriptions for 320,000 shares. On the basis of this misunderstanding, Huntington mailed certificates to the subscribers on September 6, 1995. On realizing his mistake, Dunn informed a Huntington Vice President; he urged Dunn to work with Towne to obtain additional subscriptions to meet the 320,000 target. After mailing the certificates, it was too late to recall them.

Towne finally reached the 320,000 share minimum in November, 1995. For two months, however, subscribers had held certificates in contravention of the Prospectus and Escrow Agreement. Although some investors in Towne had sold their shares after receiving them in September, 1995, plaintiffs kept their shares.

Someone at Towne apparently realized that the amended Expiration Date, as specified in the Second Amendment to the Escrow Agreement, had passed, as

Towne's files include a proposed additional amendment, dated October 1995. That proposed amendment, however, was neither executed nor sent to Huntington.

Huntington also realized that the Expiration Date had passed. In a letter dated October 5, 1995, Mr. Dunn instructed Towne: "If possible, please furnish me with any additional information you have relative to the conclusion of the escrow. We also need to discuss the unresolved matter of the extension."

Despite this awareness, Huntington took no further action to return subscriber funds or inform the subscribers that the Expiration Date had passed. Indeed, as mentioned above, Huntington had already mailed the subscriber certificates to the original investors.

Towne had experienced other difficulties. Towne did not receive its charter until late 1996. That and delays from other causes caused expenses to exceed counterbalancing income significantly. For 1996, Towne reported a net loss of $873,361. Towne's non-interest expenses for salaries, occupancy expenses and other operating expenses had exceeded $1,000,000 against net interest income of less than $140,000.

By mid–1997, Towne had come under intense scrutiny from state and federal banking regulators for lapses in banking protocols and safeguards. The Federal Reserve Board conducted an examination of Towne and, on June 30, 1997, issued a report. Based on the report, Towne's Board of Directors authorized acceptance of a Memorandum of Understanding requiring Towne to develop a capital plan, update its budgeting process, assess its management structure, and undertake other procedural changes.

Towne reported a net loss of $1,838,908 for 1997. As a result of an additional examination by state and federal banking regulators in December 1997, Towne agreed to a Cease and Desist Order effec-

tive February 4, 1998, which imposed severe requirements on Towne.

By April 21, 1998, Towne, still not in compliance with the Cease and Desist Order, decided to merge into Exchange Bancshares, Inc. By June 1998, Towne's stock had been sold to Exchange and Towne ceased operations. As a result, plaintiffs and most other investors in Towne incurred losses. Plaintiffs allege individual damages totaling $152,820.05. Damages to the putative class are alleged to total $6,557,840.90, inclusive of plaintiffs' initial investments and accrued interest.

Plaintiffs claim that Huntington caused these losses by failing in several respects to comply with the requirements of the Escrow Agreement. Huntington asserts that neither Towne nor its counsel bothered "to inform Huntington or any of the investors of the lapse" of the Expiration Date. Huntington also argues that the Escrow Agreement was modified properly pursuant to its terms to extend the Expiration Date. In addition, Huntington claims that, in any event, the plaintiffs ratified Huntington's actions and waived any claim against it when they accepted their shares without protest despite any breach of the Escrow Agreement.

I find no merit in Huntington's contentions. Plaintiffs were the third party beneficiaries of the Escrow Agreement. Rather than enforcing that Agreement strictly in plaintiff's favor, Huntington failed to uphold its express terms for plaintiffs' benefit.

I. **Plaintiffs are the Intended Third Party Beneficiaries to the Escrow Agreement**

Escrow agreements are contracts. *In re Hershiser Signature Properties,* 1997 U.S. Dist. Lexis 3420, *11 (E.D.Mich. 1997). If the escrow agent performs acts not authorized by the agreement, "liability will result for the damages induced thereby." *Pippin v. Kern–Ward Bldg. Co.,* 8 Ohio App.3d 196, 199, 456 N.E.2d 1235 (1982).

A breach of contract claim can be brought by a party to the contract or an intended third-party beneficiary. *Thornton v. Windsor House,* 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991). A contract need not specify the identity of its intended beneficiary. *Brewer v. H & R Concrete,* 1999 WL 49366, *2 1999 Ohio App. LEXIS 277, *8 (1999). A party is an intended third-party beneficiary "if the performance of the promise will satisfy an actual, supposed or asserted duty of the promisee to the beneficiary and is not intended as a gift." *Visintine v. N.Y., Chicago & St. Louis Rd. Co.,* 169 Ohio St. 505, 507, 160 N.E.2d 311 (1959).

The Sixth Circuit has defined an "intent to benefit" test to determine when a party is an intended third-party beneficiary, "[i]f the promisee ... intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract." *Norfolk & Western Co. v. United States,* 641 F.2d 1201, 1208 (6th Cir.1980). In addition, "the mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Hill v. Sonitrol of Southwestern Ohio,* 36 Ohio St.3d 36, 40, 521 N.E.2d 780 (1988) (*citing Norfolk & Western,* 641 F.2d at 1208). The court must look to the language of the contract to determine if the benefit was intended to be direct or incidental for the third party. *Brewer,* 1999 WL 49366 *2, 1999 Ohio App. LEXIS at *8.

The language of the Escrow Agreement indicates that it was created for the benefit of the plaintiffs, as investors in Towne. The purpose of the Escrow Agreement was to place plaintiffs' investment funds temporarily in Huntington's hands until either Towne had sold 320,000 shares or, at the latest, if the initial Expiration Date of December 31, 1992, was extended, until April 30, 1993. The Es-

crow Agreement details the nature of the escrow agent's duty to set aside the plaintiffs' investments until one of those two conditions was met.

It is clear from the terms of the Escrow Agreement that Towne and Huntington intended to protect the plaintiffs' investments. Plaintiffs, as intended third-party beneficiaries to the Escrow Agreement, have standing to bring forth a breach of contract claim against Huntington. *See Visintine*, 169 Ohio St. at 510, 160 N.E.2d 311 (contractor was third party beneficiary to agreement between city and railroads because it was clear from the circumstances that plaintiff's own performance was dependent upon the performance of these two parties).

## II. Huntington Had a Duty to Strictly Adhere to the Terms of the Escrow Agreement

### A. Ohio Law Governing Escrow Agreements

An escrow agent has been described as "a fiduciary agent for both parties" using the escrow agent's services. *Saad v. Rodriguez*, 30 Ohio App.3d 156, 158, 506 N.E.2d 1230 (1986). As stated in *Pippin*, 8 Ohio App.3d at 199, 456 N.E.2d 1235 (citations omitted), "the very name escrow gives it the earmarks of a trust." Accordingly, an escrow agent should place funds "beyond the control" of the parties for purposes not authorized under the Escrow Agreement. *Id.*

■ An escrow agent's duties are "fixed and limited" according to the terms of the agreement. *Id.* The escrow agent must "carry out the terms of the agreement as intended by the parties and may not perform any acts with reference to handling the deposit, or its disposal, which are not authorized by the escrow agreement." *Id.* at Syllabus ¶ 1. An escrow agent must, in other words, adhere strictly to the terms of the escrow agreement.

Ohio courts look to the terms of an escrow agreement to determine if the escrow agent fulfilled its duties under the contract. In *Romanchik v. Third Fed.*

*Sav. and Loan Assoc.*, 1975 Ohio App. LEXIS 6836 (1975), the court held that the escrow agent was liable for damages for failing to adhere strictly to the terms of the escrow agreement. In that case, the agreement obligated the escrow agent to withdraw money from the escrow account to pay for certain expenses of one party. The escrow agent did not do so. The court held that the escrow agent had neglected his "clear" duty "to carry out the agreement as intended by the parties." *Id.* at *6. Because the escrow agent did not follow the escrow agreement instructions, it faced liability for damages resulting from the breach.

Similarly, in *GMRI v. Michael Young*, 2000 WL 1145823, 2000 Ohio App. LEXIS 3682 (2000), the Ohio Court of Appeals examined the terms of the agreement to decide if the escrow agent had fulfilled it's duties. The escrow agreement permitted withdrawals from the escrow account only if the seller performed certain obligations. The escrow agent, however, gave the seller money from the escrow account before the obligations were fulfilled. The court held that "neither party was entitled to the escrow balance *pursuant to the language of the escrow agreement.*" *Id.* at *5 (remanding to trial court to consider issue of whether seller and buyer modified escrow agreement according to it's terms) (emphasis in original).

Ohio courts have emphasized that escrow agents must strictly adhere to the terms of the escrow agreement. As an Escrow Agent Huntington had to be faithful to the terms of the Escrow Agreement, or bear the consequences of its infidelity.

### B. Purpose of Expiration Date in Escrow Agreement in an All–Or–Nothing Offering

■ Escrow Agreements are used in an all-or-nothing offering to protect investment funds until enough capital is raised by the offering company. The Sixth Circuit stressed, "In an 'all or none' offering, all money previously committed must be returned to the investors if the offering

minimum is not raised and deposited in escrow by a given date." *Harris v. Agrivest Ltd. Partnership,* 1996 WL 338650, *1, 1996 U.S.App. LEXIS 16082, *4 (6th Cir.1996) (unpublished opinion) (remanding for consideration of defendants' affirmative defenses). Once a "representation has been made, it may not be circumvented by transactions primarily designed to create the appearance of a successful offering in order to avoid the refund feature of the offering." *Id.* (citing *C.E. Carlson v. SEC,* 859 F.2d 1429, 1434 (10th Cir.1988)).

Just as an escrow agreement bears some of the attributes of a trust, *Pippin,* 8 Ohio App.3d at 199, 456 N.E.2d 1235, failure to fulfill its conditions can be viewed harshly. This has been underscored by the Sixth Circuit in the context of breach of an escrow agent's responsibilities in *Harris,* in which the court stated that "failure to comply with the terms of an escrow agreement operates as a fraud upon the public." 1996 WL 338650 *1, 1996 U.S.App. LEXIS 16082, *4 (citing *SEC v. Coven,* 581 F.2d 1020, 1028–29 (2d Cir.1978)).

While not controlling law in this case, the law applicable to securities dealers likewise illustrates the importance of strict adherence to individual time limits for escrow agreements. Rule 10b–9 of the Securities Exchange Act of 1934, applicable to broker-dealers prior to a subscription offering, declares the Securities Act to be violated if a broker-dealer represents that a security is being sold on an all-or-nothing basis unless: (a) all of the securities are sold at a specified price within a specified date and (b) the seller receives the total amount due by a specified date.

The SEC has also declared that a seller of securities may not create an appearance of a successful offering to avoid refunding investor funds. Thus, the SEC has determined that an extension of the offering period in an all-or-nothing sale will automatically terminate the offer and require a refund of subscriber funds. *See Bormann v. Applied Vision Sys.,* 800 F.Supp. 800, 808 (D.Minn.1992) (*citing* 1 Thomas L.

Hazen, the Law of Securities Regulation 6.3 at 275 (2d ed.1990)).

Other cases have also discussed the role of an escrow agreement in an all-or-nothing stock offering. "The all-or-nothing provision serves not only to ensure that the issuing firm has sufficient funds to complete its project, but also to give investors some reasonable indication that they are paying a fair market price for their investments." *Svalberg v. SEC,* 876 F.2d 181, 183 (D.C.Cir.1989). The obligation to return funds to investors if certain conditions are not met is "a major protection of investors." *SEC v. Electronics Warehouse,* 689 F.Supp. 53, 64 (D.Conn.1988).

Plaintiffs' expert, Robert I. Landau, explained the importance of limiting the period of time to raise investment funds:

> A subscription escrow is entered into for a specific purpose, i.e., to enable subscribers to securities offerings to get their investment back in the event the minimum number of shares (as set forth in the escrow agreement) are not sold by the date specified in such agreement. This contractual arrangement is universally understood by participants in the securities industry and investors to provide protection for potential subscribers to stock offerings.... It's very, very unusual for an escrow to be extended, highly unusual to be extended. In the case of subscription escrows, it's just as unusual for it not to be extended, because it generally means that the deal is not going to fly; and therefore the people that put their money in to be held by the bank want to get their money back. (Doc. 281, at 15; Landau Report, Ex. 17).

The Expiration Date safeguarded the plaintiffs' investments, by guaranteeing that they would receive a refund, with interest, if the minimum capitalization had not been obtained by a date certain. Under Ohio law, Huntington was duty-bound to fulfill its obligations to the plaintiffs, on whose behalf it was acting as Escrow Agent in a quasi-fiduciary role.

### III. Huntington Continually Breached the Terms of the Escrow Agreement

█ Interpretation of a written contract is a matter of law. *Saydell v. Geppetto's Pizza & Ribs Franchise Sys.*, 100 Ohio App.3d 111, 118–119, 652 N.E.2d 218 (1994). Courts assume that parties express their intentions in the language they chose to employ in the contract, and the language will be given its ordinary meaning. *Id.* To prove a breach of contract claim, a plaintiff must show the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Doner v. Snapp* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (1994).

From December 31, 1992, to November 1995, Huntington repeatedly disregarded its duties under the Escrow Agreement when it: 1) failed to refund plaintiffs' funds on December 31, 1992, as mandated by the Escrow Agreement; and on December 31, 1993, and August 31, 1993, as required by the amended Escrow Agreement; 2) issued subscriber certificates on September 6, 1995, before the requisite number of shares were sold; and 3) after failing to return all funds on the lapse of the last Expiration Date, it continued, without authority to do so, to accept and retain money as an Escrow Agent.

### A. Huntington's Breach of the Escrow Agreement on December 31, 1992

█ The original Escrow Agreement stated that the Agreement would terminate on December 31, 1992, "provided, however that the Company may, by letter to the Escrow Agent, extend the Expiration Date by up to . . . April 30, 1993." Unless Huntington was notified by a letter from Towne that it should extend the Expiration Date, the Escrow Agreement directed Huntington to return all investments with interest promptly to each subscriber. In that situation, Huntington, if it were to fulfill its obligations under the Agreement, had no other option.

On July 1, 1992, Towne sent Huntington a letter extending the original fallback date (April 1, 1993) as stated in the Escrow Agreement, to June 30, 1993. As thus amended, the Escrow Agreement provided that the Agreement would terminate on December 31, 1992, unless the bank, by "letter to the Escrow Agent, extend[ed] the Expiration Date to . . . June 30, 1993."

There is no evidence in the record that Towne ever sent a letter to Huntington extending the Expiration Date to June 30, 1993. Absent such written instruction and authorization, as expressly called for in the Escrow Agreement, Huntington had to refund all subscribers' funds promptly.

Huntington did not do so. It did not contact any plaintiffs or Towne about the lapse. Because Huntington kept the funds, and continued to act as the Escrow Agreement after December 31, 1992, it was in breach of the terms of the contract. From that point on, it was acting *ultra vires.*

### B. Huntington's Breach of the Amended Escrow Agreement on August 31, 1993

Huntington again breached the terms of the amended Escrow Agreement by failing to return investor funds promptly by August 31, 1993.

On June 30, 1993, Towne and Huntington agreed to an amendment of the Escrow Agreement. The amendment imposed additional duties on Huntington and Towne. It required Towne to deliver each existing subscriber an Amended Subscription Agreement. Huntington was also required to return individual subscribers' funds *unless* it obtained an endorsed Subscription Agreement from each pre-June 30, 1993 subscriber on or before August 31, 1993. If by that date, Huntington had not received an Amended Subscription from the investors, Huntington was obligated to return each subscriber's proceeds "promptly."

Towne never mailed Subscription Agreements to any investor. Huntington acknowledges that it did not receive any endorsed Amended Subscription Agree-

ments as required by the Amended Escrow Agreement. Huntington failed to respond to the phone call from Towne's counsel, in which the attorney asked Huntington to certify that it had complied with its duties under the Amended Escrow Agreement.

Pursuant to the terms of the Amended Escrow Agreement, Huntington was required to refund the monies in the Escrow Account when Amended Subscription Agreements were not forthcoming. Not having received those agreements, Huntington's failure to refund the escrowed funds by August 31, 1993, constituted another breach of its obligations as Escrow Agent.

### C. Huntington's Breach of the Amended Escrow Agreement on December 31, 1993

As mentioned above, Towne and Huntington agreed on June 30, 1993, to an amendment of the Escrow Agreement. The Second Amendment permitted further postponement of the Expiration Date until December 31, 1993, and then until June 30, 1994, if Towne had sent a letter directing such extension. Once again, Huntington was obligated to refund the escrowed funds if the shares had not been subscribed by the extended Termination Date.

Huntington admits that Towne did not write a letter extending the contract to June 30, 1994. In addition, no other written agreements were signed by Towne and Huntington extending the amended Escrow Agreement past December 31, 1993. After then, Huntington was required, but failed, to return the subscribers' funds. When it did not do so, it again breached its duties to the subscribers.

### D. Huntington Breached Escrow Agreement By Retaining Money After December 31, 1993

 Huntington argues that plaintiffs who invested in Towne after June 30, 1994, have no cause of action for breach of contract. According to Huntington's argument, post-June 30, 1994 investors could not bring a breach of contract action for an agreement that expired on June 30, 1994.

Huntington implies that it could properly hold funds from post June 30, 1994 investors indefinitely and without any limitations. The argument is flawed.

Post June 30, 1994 plaintiffs purchased subscriptions with checks payable to Huntington as Escrow Agent. These plaintiffs were also informed that their investments would be held by Huntington until enough shares had been sold to release the funds to Towne. Both Towne and Huntington, therefore, specifically instructed post-June 30, 1994 plaintiffs that their subscriptions would be governed by the terms of the Escrow Agreement.

Furthermore, the purpose of the Escrow Agreement was to provide plaintiffs with a safeguard for their investment. Therefore, post June 30, 1994 investors were also third party beneficiaries to the Escrow Agreement.

Huntington had no authority under the Escrow Agreement to accept and retain plaintiffs' funds after December 31, 1993. Acting in derogation of the Escrow Agreement, Huntington properly should be held accountable for the consequences of it's *ultra vires* actions. Having held itself out and functioned as Escrow Agent without authority to do so, Huntington cannot evade its responsibility by renouncing the legitimacy of its conduct. Nor can it allocate the risks created by its own ignorance and misconduct to the plaintiffs, who were misled by its actions.

### E. Huntington Breached Escrow Agreement by Mailing Subscriber Certificates on September 6, 1995

As detailed above, Huntington, due to a miscalculation by the officer in charge of the escrow, released Towne's shares to its subscribers before the subscription had been completed successfully. Huntington likewise breached the Escrow Agreement when it issued plaintiffs' shares of stock on September 6, 1995, before the requisite number of shares had been subscribed. This action constituted another breach of the Escrow Agreement.

### F. Huntington and Towne Did Not Modify the Escrow Agreement

Huntington argues that none of the above actions constitute a breach of contract, because Towne and Huntington were free to modify the Escrow Agreement, either expressly or implicitly.

### Towne Did Not Modify Expiration Date by Board Minutes

Huntington argues that the minutes of meetings of Towne's Board of Directors evidence a mutual agreement between Huntington and Towne to extend the Escrow Agreement to June 30, 1995, and, thereafter, to December 31, 1995. Huntington argues that the "mutual agreement" extended the life of the Escrow Agreement, thereby preventing any liability for breach of the contract.

 Contracts are ordinarily subject to written or oral modification by the parties. *Software Clearing House v. Intrak, Inc.,* 66 Ohio App.3d 163, 172, 583 N.E.2d 1056 (1990). Subsequent acts and oral agreements may not, however, modify the terms of a contract if the contract specifically states that a writing is necessary. *Morrison v. Devore Trucking,* 68 Ohio App.2d 140, 143, 428 N.E.2d 438 (1980).

 The April 14, 1994 meetings contain the following statements: "A general discussion about extending the offering was held. Weinert moved that we extend the offering from June 30, 1994 to June 30, 1995. Bechstein seconded the motion. The motion passed unanimously." The minutes contain no reference to the Escrow Agreement or Huntington. The minutes make no reference to the presence of a Huntington representative. Huntington does not allege that it was ever informed of the decision either orally or in writing.

Huntington relies on a further extension by Towne's board on April 27, 1995. The minutes of that meeting state, "A general discussion on the stock offering extension was held. Brigham moved and Weinert seconded to exten[d] the offering until December 31, 1995. Motion carried." Once again, the minutes do not show that any-

one from Huntington was in attendance. Huntington does not allege that it was informed about either the meeting or the Board's decision to extend the Termination Date either orally or in writing.

The original Escrow Agreement stated that the agreement would terminate on December 31, 1992, "provided, however that the Company may, *by letter to the Escrow Agent,* extend the Expiration Date by up to ... April 30, 1993." (emphasis added). Similarly, the June 30, 1993 amendment to the Escrow Agreement stated that the funds would be returned to the investors on December 31, 1993, "provided, however, that the Company may, *by letter to the Escrow Agent,* extend the expiration date to June 30, 1994." (emphasis added). Absent a letter extending the Agreement to June 30, 1994, the Amended Escrow Agreement obligated Huntington to return the funds promptly.

Huntington argues that Towne's Board of Directors minutes are sufficient to extend the Escrow Agreement to December 31, 1995. I disagree. These minutes were not transcribed for the purpose of amending the Escrow Agreement. The minutes merely record the Board's decision to extend the Escrow Agreement to June 30, 1994 and December 31, 1995, respectively.

More importantly, Huntington does not allege that it received a copy of these minutes much less more formal notice of the board's action. Huntington cannot rely on minutes that they never received or saw. Therefore, I conclude that the Board minutes did not properly extend the life of the Escrow Agreement as demanded by the terms of that agreement. *See Saydell,* 100 Ohio App.3d at 122, 652 N.E.2d 218 (court held that parties did not modify contract to find a mutually agreeable site when the contract required the modification to be in writing and no writing was produced); *GMRI,* 2000 WL 1145823 *1–2, 2000 Ohio App. LEXIS at *4–5 (remanded to trial court to consider modification issue where seller and buyer sent written agree-

**1128**

ment explicitly modifying escrow agreement to the escrow agent).

## Huntington and Towne Could Not "Implicitly" Agree To Modify Contract

██ Huntington argues that its retention of the subscription proceeds past the Expiration Date manifested an implicit agreement with Towne to modify the terms of the Escrow Agreement. Huntington also alleges that Towne "retained the unilateral right to extend the distribution dates and no consent of Huntington or the subscribers was necessary."

The argument fails to consider 1) plaintiffs' status as third-party beneficiaries to the contract; 2) the purpose of Escrow Agreements; and 3) Huntington's responsibilities, as Escrow Agent, to the plaintiffs.

The Second Restatement of Contracts, § 311(1) provides, "[D]ischarge or modification of a duty to an intended beneficiary by conduct of the promisee or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides." Comment (b) to § 311(1) states:

> Agreements precluding variation of a duty to a beneficiary before the beneficiary knows of the promise are unusual and would often be unwise ... But the power of the parties to make such an agreement is not restricted by special formal requirements. The agreement need not be explicit: omission of a standard clause reserving a power of modification may manifest an intention to preclude modification.

See also *Hill*, 36 Ohio St.3d at 40, 521 N.E.2d 780 (adopting 2d Restatement of Contracts (1981) § 302 for intended and incidental beneficiaries); *Olson v. Etheridge*, 177 Ill.2d 396, 226 Ill.Dec. 780, 686 N.E.2d 563, 568 (1997) ( § 311 "represents the majority view" for varying the rights of third-party beneficiaries).

The Escrow Agreement and subsequent amendments provided a termination date after which Huntington was required to return plaintiffs' funds. The Escrow Agreement and its amendments also stated explicitly that any modification of these dates must be communicated by a letter from to Huntington. These terms necessarily created a promise to plaintiffs that their investments would be returned after a date certain, if Towne could not achieve its goals, and the date was not properly extended.

Under Restatement § 311(1), the Escrow Agreement contained specific terms detailing modification of the Expiration Dates. Huntington and Towne were not free to modify the Expiration Date without regard to any stipulations in the Escrow Agreement.

In addition, allowing Huntington and Towne to change these dates, and thereby alter a material term of the Escrow Agreement without prior notice to the plaintiffs that they could or would do so, would undo the protection that the Agreement was designed, intended and expected to fulfill. Allowing the seller and escrow agent to modify the terms of the Expiration Date at will would leave the investor with little, if any, protection in an all-or-nothing offering.

Huntington's claim of implicit modification of the Escrow Agent is premised, in essence, on the perception that the terms and conditions of the Escrow Agreement were meaningless, and that no term had less meaning than the Expiration Date. Ohio law does not, and this court will not, allow parties to an escrow agreement to erase the agreement's fundamental terms, or to eliminate their effect through inaction and inattentiveness. Huntington's claim of implicit modification is without merit.

## IV. Plaintiffs' Damages Were Foreseeable

██ In a breach of contract case, damages can only be awarded for "the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of

the making of the contract." *Toledo Group v. Benton Indus.*, 87 Ohio App.3d 798, 806, 623 N.E.2d 205 (1993). Huntington argues that plaintiffs' damages were not a foreseeable result of its breach of the Escrow Agreement. Huntington contends that "[p]laintiffs' damages are actually the result of [Towne's] mismanagement and failure, not of Huntington's administration of the escrow."

As noted in an earlier order, whatever liability may accrue to Towne, Huntington's liability, at least vis-a-vis the plaintiffs, has its own origin. (Doc. 284, Ex. 31) ("[the] decisions and practices that lead to Towne's downfall, have no bearing on the question of whether Huntington breached its obligations under the escrow agreement. If so, it is liable to the shareholder plaintiffs for the losses they incurred. If not, then whatever happened after Towne opened its doors is immaterial.").

Next, Towne would not have been able to engage in mismanagement and the loss of plaintiffs' investment, if Towne had not received these funds in the first place. The Escrow Agreement was intended to protect the plaintiffs' investments. Plaintiffs were informed that they would recover their entire investment from Huntington unless Towne sold 320,000 shares by a specified date. That date—and later dates—came and went and Huntington did not return the funds to the plaintiffs. Instead, nearly two years after the specified date, Huntington turned the funds over to Towne.

As Escrow Agent, Huntington had a special duty to protect the investor funds. Huntington knew that the purpose of the agreement was to protect the investor funds up to a certain period of time. After the time passed, however, Huntington did not refund the funds to plaintiffs. Huntington knew that Towne had been unable to obtain the needed funds or subscriptions. It could reasonably have concluded that its noncompliance with its duties under the Escrow Agreement placed the plaintiffs at risk of loss. I conclude that plaintiffs' losses were a foreseeable conse-quence of Huntington's improper decision to give plaintiffs' investments to Towne, instead of returning them to plaintiffs.

### V. Waiver and Ratification

Although Huntington breached its obligations to the plaintiffs under the Escrow Agreement, it contends that the plaintiffs' failure to request a refund after the Expiration Date described in the original Prospectus, investment (by some of the plaintiffs) after that date, and, finally, acceptance and retention of the shares when issued constituted either a waiver of their right to a remedy or ratification of Huntington's acts, or both.

■■■ Ratification occurs when a principal accepts the conduct by an agent that contravenes the principal's rights, and could give rise to a claim by the principal against the agent. *Cary v. Patton*, 1997 WL 175501 *2–3,1997 Ohio App. LEXIS 1592, * 6–7 (1997). As plaintiffs point out, ratification is not available absent the existence of an underlying principal-agent relationship. In this case, plaintiffs claim that Huntington was Towne's agent, not theirs. Huntington has not responded to this argument.

Normally, an escrow agent is an agent of the "parties" to the agreement. *Spalding v. Coulson*, 104 Ohio App.3d 62, 81, 661 N.E.2d 197 (1995). Huntington shall be granted leave to respond to plaintiffs' assertion that the only parties to the Escrow Agreement were Huntington and Towne, even though plaintiffs were the depositors who made payments into the escrow fund, which was created for their benefit.

Huntington shall, accordingly, address the question of whether the plaintiffs were "parties" to the Escrow Agreement. If so, Huntington can assert a ratification defense. If not, Huntington's defense of ratification is without merit, because it cannot be asserted absent a showing of an agency-principal relationship.

■■■ In any event, waiver and ratification are equitable defenses, *Weaver v. Weaver*, 36 Ohio App.3d 210, 212, 522

N.E.2d 574 (1987); *AFCO Credit Corp. v. Brandywine Ski Ctr.,* 81 Ohio App.3d 217, 221, 610 N.E.2d 1032 (1992), as to which Huntington has the burden of proof. *White Co. v. Canton Transp.,* 131 Ohio St. 190, 2 N.E.2d 501 (1936) (syllabus ¶ 1). Equally crucial to both defenses is knowledge on the part of the plaintiffs of Huntington's breach of their rights under the Escrow Agreement. Huntington alleges that the plaintiffs were aware of the passage of the Expiration Date, but did not act on such knowledge. Even though Huntington's obligation to refund the subscription monies being held in escrow would appear to have been absolute, Huntington argues that the plaintiffs failed to exercise minimal diligence when they failed to request such refund. Huntington also claims that Towne kept plaintiffs fully informed about the problems being encountered with reaching the capitalization goal.

Plaintiffs contend that they lacked sufficient knowledge to impose any duty to mitigate, much less a finding of waiver or ratification, on them. Plaintiffs also argue that they were under no duty to seek a refund or otherwise to mitigate or avoid the risks inuring in this set of transactions.

Ultimate resolution of Huntington's claims of waiver and ratification (if it can assert such) depends on a determination of what plaintiffs knew, when and how they knew it, and whether that knowledge, in light of the other elements of those defenses, excused Huntington's various breaches of its obligations under the Escrow Agreement. The record before the court presently is insufficient to grant summary judgment to either party on these defenses.

#### Conclusion

In light of the foregoing, it is

ORDERED THAT:

1. Partial summary judgment be, and the same hereby is granted in favor of the plaintiffs and against the defendant Huntington on plaintiffs' claim that Huntington breached obligations to the plaintiffs arising as a result of plaintiffs' status as third party beneficiaries of the Escrow Agreement between Huntington and Towne Bancorp;

2. Partial summary judgment be, and the same hereby is granted to plaintiffs and against Huntington as to plaintiffs' claim that the damages that they incurred, if any, were a foreseeable consequence of Huntington's breaches of the Escrow Agreement; and

3. Summary judgment be denied to both parties as to Huntington's defenses of waiver and ratification, without prejudice.

The Clerk shall set this case forthwith for a status conference.

So ordered.