ALEX FITZHUGH, Plaintiff, Appellee, v. R. B. THODE, Defendant, GEORGE HARNAGEL, Defendant, Appellant.

No. 43242.

MARCH 10, 1936.

Cunningham & Scott, for appellant.

Gamble, Read & Howland, for appellee.

PARSONS, J.—The plaintiff, Alex Fitzhugh, and the defendants, R. B. Thode and George Harnagel, entered into a contract set out in plaintiff's petition as "Exhibit A", which contract was as follows, to wit:

"Whereas the said parties have purchased and are the owners in common of the following described real estate situated in the County of Polk, State of Iowa, to-wit: The Southwest Quarter of the Northeast Quarter of Section 22, Township 78, North Range 24 West of the 5th P. M. Iowa.

"Now, whereas the above described property is being purchased from Bell Smith under contract for $16,000, payable as follows: Two Thousand Dollars cash, $2,000 on the 15th day of May, 1919, $3,000 on the 15th day of November, 1919, $3,000 on the 15th day of May, 1920, $3,000 on the 15th day of November, 1920, and the balance of $3,000 on the 15th day of May, 1921, deferred payments to bear six per cent interest per annum payable semiannually.

"Now, whereas, the said Alex Fitzhugh is to furnish the money for the above purchase, and the legal title of said land is to be held by him. Now, therefore; it is hereby mutually agreed by and between the parties hereto, that the proceeds realized from the sale of said real estate when sold, together with the income, if any, from said real estate, after payment of taxes and all costs of every kind and nature, shall be applied as follows: One-half to Alex Fitzhugh and one-half to R. B. Thode and George Harnagel, and should any loss be incurred by reason of the purchase of said real estate, such loss shall be borne one-half by Alex Fitzhugh and one-half by R. B. Thode and George Harnagel.

"It is further agreed that the best efforts shall be made by all parties hereto, to accomplish the sale of said land, and when a profit of 25% or more can be obtained parties hereto shall agree to a sale. Unless profits from sales, or income from said property shall be sufficient to carry taxes, interest and charges

and insurance at the end of two years from this date and thereafter, it is understood that Thode and Harnagel will carry one-half and Fitzhugh one-half of such sums after said two years period has expired. And said Fitzhugh acknowledges receipt of $212.50 from Thode and Harnagel, whereby the amount of their half of the principal to be paid to him and to bear seven per cent interest is reduced to the sum of $7,787.50.

"Dated at Des Moines, Iowa, this 15th day of November, 1918.

"Alex Fitzhugh
"R. B. Thode
"George Harnagel"

Subsequently, on March 29, 1922, the parties signed an agreement set out in the answer and cross-petition of Harnagel as "Exhibit 1". This agreement contained several clauses, among them reciting the making of the first contract November 15, 1918, between the three parties, and that it was desired to allow Thode a commission for selling the property. It then provided that it was agreed between R. B. Thode, party of the first part, and Alex Fitzhugh, party of the second part, certain things: That the first party, Thode, within sixty days was to survey, stake, and plat the land involved into lots at his own expense, lay out such roads, except grading, and lay such sidewalks as he might deem necessary or advisable; that a schedule of prices be fixed on such lots so as to produce a minimum average return of at least $1,000 an acre, and as much more than that as was possible; also providing how such lots were to be sold, on contract. Thode was to advertise the property, pay all expenses in connection therewith; he was given the exclusive right to sell, have full and peaceful possession of the land for the purpose of developing and selling same; and in clause 5 it provided as follows:

"In full compensation for the services (including disbursements) in carrying out this contract and making sales of said property, the party of the first part shall receive 25% of the purchase price of each lot sold. Payments made upon the principal shall be divided, one-half to the party of the first part, and one-half to the party of the second part, as such payments are made, until the party of the first part shall have received the commission due him; and thereafter all such collections shall be

paid over to the party of the second part. Taxes or special assessments upon said land shall be paid by first party and charged to the amounts payable to the second party hereunder. If it is necessary to borrow money to pay any such taxes or special assessments, or other matters chargeable against the party of the second part, it is agreed that the interest on such amounts shall be paid by the party of the first part and charged to the amounts payable hereunder to the party of the second part.''

Clause 6 provided that the right of the first party, Thode, to make sales should terminate in three years from the date of the agreement, and any extension of such rights should only be by written agreement signed by the parties thereto.

By clause 7 Thode was to keep an itemized account, showing details of each transaction, and to furnish this to Fitzhugh and make the payments coming to Fitzhugh at the time of furnishing statement.

Clause 8, in part, was as follows: ''that is to say, it is understood that of such remaining seventy-five per cent on and such sale hereunder, fifty per cent would go to Fitzhugh, twenty-five per cent to George Harnagel and twenty-five per cent to said R. B. Thode, either to apply on said purchase price of said land as between themselves, or to be paid to them individually or otherwise disposed of by second party, as may be proper in view of the mutual accounts between said parties under said contract of November 15th, 1918, regarding said land. Interest paid from time to time on any lot purchase shall be divided among (or credited between) said three parties in the same proportions as above provided for payments of principal, and as may be proper in view of the said contract of November 15, 1918.''

This agreement is signed by George Harnagel, in addition to R. B. Thode and Alex Fitzhugh, above named, to show that he assented to the making of the contract.

The expectations of the parties of making a fortune out of the land purchased, were not realized, and on the 17th day of September, 1928, Fitzhugh drew up a ''Notice of Termination'' as follows:

''NOTICE OF TERMINATION
''To R. B. Thode and George Harnagel:
''You are hereby notified that I, Alex Fitzhugh, herewith give notice of the immediate termination of the following de-

scribed contract, to-wit: (copy of contract the same as Exhibit 'A' attached to plaintiff's petition)

"That I hereby terminate this agreement for the reason that you have breached and continued to breach the contract by reason of your failure to carry your portion of the loss which has accrued to you and is payable by you by virtue of paragraph 8 of said agreement.

"You are hereby notified because of the breach and for the purpose of forestalling any additional loss or expense that I will dispose of said property as soon as an advantageous price can be secured for the same. That upon disposal of said property I shall hold you accountable for your share of the loss which was assumed by you by virtue of the terms of the above contract.

"Dated this 17th day of September, A. D. 1928.

"Alex Fitzhugh."

Thode acknowledged service of this notice the 19th of September, 1928, and Harnagel the 28th day of September, 1928.

At the time and prior to the giving of the notice of termination, Fitzhugh had made an arrangement to hold an auction sale of the property, which had become known as the "Morningside" addition, and was divided into eighty lots of about one-half acre each. The sale was to take place September 28th and 29th, and it was so advertised. Amongst other things in the advertisement appeared:

"FREE! One Lot will be given away Free in addition to many FREE cash prizes."

The advertisement had the approval of Mr. Fitzhugh, and bore the statement that Mr. Fitzhugh had subdivided this property a few years before and had sold out a number of one-half acre tracts at from $500 to $650 each,—"and they are worth it".

Prior to this time Mr. Fitzhugh had borrowed $8,000 of an insurance organization; the loan was coming due, although it had been reduced considerably, and the land was deeded by Fitzhugh to the holder of the mortgage in satisfaction of same, but Fitzhugh was given the right to repurchase the property within two years. He had given notice to Harnagel and Thode August 3, 1933, by letter, advising them in regard to his arrangement to turn over the Morningside property for cancellation of the mort-

gage indebtedness. At the bottom of the letter was printed: "Will you please indicate your acceptance of the arrangement outlined above". It doesn't appear whether this was ever answered or accepted.

It was a contention of the defendant Harnagel, in his answer, that a mortgage was placed on the property in direct violation of the contract of November 15, 1918, which provided that the plaintiff was to furnish the money in payment for said property, and that the plaintiff caused all the losses, if any, by himself, by reason of failure to comply with the terms of the contract, and was wholly responsible therefor; he alleged that the purpose of the plaintiff in terminating the contract of November 15, 1918, and in serving notice thereof, was not to prevent or forestall losses, but to exclude the defendants from participation in profits which the plaintiff expected would arise and be had from the sale of the real estate, and to prevent the defendants from getting back the money they put in the venture. He further pleaded that by reason of Thode having assumed complete ownership and control of the property and accepted all of the benefits therefrom, and completely and wholly disregarded the defendant Harnagel's interest, he is estopped from recovering any of the losses, if any, suffered by plaintiff. In the second division of the answer and by way of cross-petition, it is alleged that the parties became the owners of the real estate in Polk county, Iowa, title of which was to be held by plaintiff, and he was to furnish the money for the purchase price in the sum of $16,000; that the plaintiff, in direct violation of the terms of the contract, placed the mortgage upon the property in a sum unknown to the defendant, and converted the same to his own use; and that by reason of plaintiff's breach and failure to perform, the defendant suffered from his venture with this property. He also alleged that in 1927 Fitzhugh assumed absolute control and ownership of the property and served the notice of forfeiture on September 28, 1928, and took over all the assets arising out of and received under the terms of the first contract, as well as all rents, profits, and sales moneys; that the reasonable value of the property at the time plaintiff took it over was $1,000 per acre; and that by reason of the plaintiff's breach and his unwarranted and unlawful acts in assuming and exercising control over said property and treating the same as his own, and advertising it to the public as his own, defendant suffered damages equivalent to

one-fourth the difference between the purchase price of said tract of land, to wit, $400 per acre, and the reasonable value thereof on the 28th of September, 1928, or $6,000.

The oral evidence in the case is not as satisfactory as it should be. It doesn't seem to throw so very much light on the propositions involved. It is evident, however, that there was a loss on the venture. The question first arising in the case is as to the construction of the contract entered into on the 15th day of November, 1918. That contract recites the purchase of the land from Bell Smith under a contract for $16,000; $2,000 cash and the balance in payments at 6 per cent per annum. It also recited that all of the parties were to use their best efforts to accomplish the sale of the land, and unless profit from sales or income from said property was sufficient to carry taxes, interest, and insurance, at the end of two years Thode and Harnagel would carry one-half and Fitzhugh one-half of such sums after said two years period had expired; and it acknowledged receipt of $212.50 from Thode and Harnagel, to apply on their part of the purchase price, which reduced their amount to $7,787.50.

It will be observed that Fitzhugh was to advance the money to carry the contract. The deferred payments on the contract of purchase were to draw interest at 6 per cent only, but Fitzhugh was to get 7 per cent. What does it mean, that Fitzhugh was to furnish the money? Was he simply to furnish the money for the first payment of $2,000, or was he to furnish the money to take up the separate payments due Bell Smith on the purchase price, which bore 6 per cent interest? And were Thode and Harnagel to carry one-half of it after two years expired, and not before? Fitzhugh did furnish the money for the $2,000 as first payment. We think perhaps under the circumstances a fair construction of the contract is that this was what Fitzhugh was to furnish, and from that time on the parties were to divide according to their respective interests, Fitzhugh carrying one-half and Harnagel and Thode one-half. The evidence was submitted to the court in December, 1934, and on December 31, 1934, the court entered a decree and found, correctly, that there was a joint adventure or partnership between the parties to this action and that it was evidenced by the contract of November 15, 1918, and that the plaintiff was entitled to one-half of the profits of the adventure and liable for one-half the losses sustained, and that the defendants Harnagel and Thode were entitled to a half and

540

liable for a half of the losses. Again the court found that the partnership agreement terminated by service of the notice upon Thode and Harnagel in September, 1928; and that no action was taken by plaintiff releasing the defendants from the liability imposed upon them by the contract referred to for one-half the losses arising from the joint adventure; that the extent of loss sustained in said joint adventure was determined on or about August 13, 1932, when the plaintiff surrendered the property remaining in his hands to the insurance company, holder of the first mortgage; that upon the cross-petitions of defendants the court found the equities of the cause were with the plaintiff, and the defendants were denied the relief they prayed for, and the amount to which plaintiff was entitled involved computations of interest, and involved the allowance of credits for payments made by or on account of both defendants during the period prior to 1927; and that the cause should be continued for the purpose of a final accounting, unless the parties agreed as to the amount to which plaintiff was entitled. The court found that in determining the amount of loss sustained in connection with the partnership arrangement involving the purchase and sale of the property, and that in determining the amount of the losses sustained, plaintiff was entitled to interest at 6 per cent per annum on one-half of the purchase price of the real estate, less credits and additions, if any, to be determined as thereinafter provided. The court further ordered and adjudged that an accounting be had between the parties, and that the cause be continued to the January, 1935, term of court; that if within sixty days after the entry of the decree the parties filed in the office of the clerk of the court a statement or stipulation signed by the attorneys for all parties showing the amount to which the plaintiff was entitled, the clerk was directed to enter judgment against the defendants jointly for such amount; and then the court reserved jurisdiction to appoint a referee, in case the stipulation were not filed, or to make such further orders with respect to the matter as might be proper under the circumstances; the costs were taxed to the defendants jointly. From this decree the defendant Harnagel appeals.

█ █ █ In this accounting it must be borne in mind that the original contract contained the clause, ''Should any loss be incurred by reason of the purchase of said real estate, such loss shall be borne one-half by Alex Fitzhugh and one-half by R. B.

Thode and George Harnagel.'' So, in the accounting, one half of the loss should be charged to Fitzhugh, and the other half to Thode and Harnagel, and we see nothing in the following portion of the contract, to wit:

''Unless profits from sales or income from said property shall be sufficient to carry taxes, interest, charges and insurance, at the end of two years from this date and thereafter, it is understood that Thode and Harnagel will carry one-half and Fitzhugh one-half of such sums after the two years period has expired.''

This clearly refers to and means that if during the first two years the profits from sales and incomes from said property were not sufficient to carry taxes, interest, and insurance, at the end of the two years from date of the contract and thereafter, Thode and Harnagel would be chargeable with one-half of the expenses, whether it occurred during the two year period or during the subsequent period during which the parties carried the land.

■■■ The court was right in ordering an accounting between the parties and in the holding that Thode and Harnagel were to pay one-half of the loss; that is, that the two were to pay it. There was no provision for a division between them, but the contract recited that Thode and Harnagel were to make the payments or stand the losses to the amount of one half, and Fitzhugh was to stand the other half. Thode and Harnagel were thus treated as one party, and this is in accordance with the original contract, which recites that the agreement was made between Alex Fitzhugh, party of the first part, and R. B. Thode and Harnagel, parties of the second part.

Whether or not the service of the notice of termination of contract in September, 1928, was sufficient of itself to dissolve the partnership or joint adventure, we regard as immaterial for the reason that all persons thereafter seemed to treat it as though dissolved. All loss that had been incurred to that time would be in an accounting chargeable, in our opinion, one half to Fitzhugh and the other half to Thode and Harnagel, the other members of the joint adventure.

■■■ The original contract provided no time for its termination. It was therefore terminable at will by a notice of any one of the parties. 47 C. J. p. 1104, section 78 says:

''Where no fixed term has been agreed upon for the dura-

tion of the partnership, or where no term is fixed by the nature of the business, and it is therefore a partnership at will, any partner may dissolve it at any time without the consent of his co-partners, by notice to all the other partners of his intention so to do, and in many jurisdictions this rule is embodied in the statute. A partner may exercise this right to dissolve the partnership for any reason which he deems sufficient, or even arbitrarily, or from a mere whim, and is not liable for damages which has resulted to his co-partners by reason of his action.''

No objection seems to have been made to accepting this notice. It will be noted that the notice further contained the provision that Fitzhugh would dispose of the property and would hold his copartners accountable for their share of the losses. Acting upon this dissolution by nonaction, i. e., failure to object, they accepted, and cannot now be heard to object that the joint adventure was at that time dissolved, and that accompanying the dissolution, and as a part of it, was the statement by Fitzhugh that the other two partners would be held liable for their share of the losses.

This was not merely a partnership; it was a joint adventure. Any person legally competent to contract may become a party to an adventure. 33 C. J. p. 847, section 18. A joint adventure may only exist by voluntary agreement of the parties to it. 33 C. J. p. 847, section 17. A joint adventure cannot be terminated by one or more of the parties to it, even if a valid reason exists for doing so, without giving notice of the termination to the other party or parties. 33 C. J. p. 850, section 28.

33 C. J. p. 855, section 46, lays down the rule:

''A joint adventurer who contributes to the capital employed in the enterprise more than the amount which he agreed to contribute as his share, or who pays a joint liability of himself and his associates, or a debt incurred in the business, or his individual note given for such debt, or a joint note given by him and his associates, does not thereby acquire any greater interest in the venture or share in the profits thereof, but is entitled to demand from each of his associates the repayment to him of such a sum as will equalize their contributions to the enterprise as agreed upon amongst them, and may enforce the demand by the appropriate action at law or in equity.''

Goss v. Lanin, 170 Iowa 57, 61, 152 N. W. 43, 45, had to do with the question of joint adventure. We quote from page 61 of the opinion:

"And, although courts in modern times do not treat a joint venture as identical with a partnership, it is so similar in its nature and in the contractual relationships created by such adventure that the rights as between themselves are governed practically by the same rules that govern partnerships. As some of the courts hold, while a partnership is ordinarily formed for the transaction of general business of a particular kind, a joint adventure, as a rule, relates to the single transaction, although it may comprehend a business to be continued for a period of years." Citing the following authorities: McCreery v. Green, 38 Mich. 172; Alderton v. Williams, 139 Mich. 296, 102 N. W. 753; Knapp v. Hanley, 108 Mo. App. 353, 83 S. W. 1005; Felbel v. Kahn, 29 App. Div. 270, 51 N. Y. S. 435; Derickson v. Whitney, 6 Gray (Mass.) 248; Field v. Woodmancy, 10 Cush. (Mass.) 427; O'Hara v. Harman, 14 App. Div. 167, 43 N. Y. S. 556; Bradley v. Wolff, 40 Misc. 592, 83 N. Y. S. 13. This same case cites approvingly Hart v. McDonald, 52 La. Ann. 1686, 28 So. 169, and further says:

"It is also held by authority that, where the undertaking involved in the adventure is based upon certain estimates which require expenditure of money and time, and it afterwards develops that without fault of either party more money and time were required than contemplated, to render the enterprise successful, either party may withdraw from the adventure without becoming liable to the other."

47 C. J. p. 1109, section 762, lays down the rule that:

"When a notice of dissolution is given, either by word or by act, there is an actual dissolution of the partnership, and, in the absence of any statute requiring notice for a specified time, a partnership at will may be dissolved immediately upon the giving of a notice of intention to dissolve. The notice of dissolution may, however, specify a date in the future at which the dissolution shall become effective, and in such case the partnership is dissolved on the day stated."

"Where a partnership is created not merely in profits and losses, but in the property itself, the property is transferred

from the original owners to the partnership, and becomes the joint property of the latter; a corresponding obligation arises on the part of the partnership to pay the value thereof to the individuals who originally contributed it; such payment cannot indeed be demanded during the continuance of the partnership, nor are the contributors, in the absence of agreement, or usage, entitled to interest; but if the assets of the partnership, upon a final settlement, are insufficient to satisfy this obligation all the partners must bear it in the same proportion as other debts of the partnership.'' 2 Mod. Law of Partnership, Rowley, p. 911, section 670.

In this case, by the terms of the original agreement, the property in question, the 40 acres of Bell Smith, the agreement recites:

''Whereas the said parties have purchased and are the owners in common of the following described real estate'' (which is the real estate involved).

The property is thus the property of the joint adventure; hence a corresponding obligation arises on the part of the joint adventure to pay the value thereof to the individuals who originally contributed. The assets of the partnership were insufficient to satisfy this obligation, so all the partners must bear it in the same proportion as the other debts of the partnership.

Hence, in view of the foregoing, the original decree is modified to the extent pointed out herein as to how the accounting shall be done, and as modified is affirmed.—Modified and affirmed.

DONEGAN, C. J., and ALBERT, KINTZINGER, and RICHARDS, JJ., concur.