[Cite as *Meinert Plumbing v. Warner Industries, Inc.*, 2017-Ohio-8863.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104817**

# MEINERT PLUMBING, ET AL.

PLAINTIFFS-APPELLANTS

vs.

# WARNER INDUSTRIES, INC., ET AL.

DEFENDANTS-APPELLEES

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-10-733355, CV-11-750011, CV-11-751467, CV-11-752926,
CV-12-787434, and CV-13-802261

**BEFORE:** Laster Mays, J., E.A. Gallagher, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 7, 2017

-i-

**ATTORNEYS FOR APPELLANTS**

Steven W. Albert
The Albert Law Firm
29425 Chagrin Boulevard, Suite 216
Pepper Pike, Ohio 44122

John C. Kealy
123 West Prospect Avenue, Suite 250
Van Sweringen Arcade
Cleveland, Ohio 44115


**ATTORNEYS FOR APPELLEES**

K. James Sullivan
Mitchell G. Blair
Lindsey E. Sacher
Anthony F. Stringer
Calfee, Halter & Griswold, L.L.P.
1405 East Sixth Street
Cleveland, Ohio 44114

ANITA LASTER MAYS, J.:

{¶1} Plaintiffs-appellants[1] appeal the trial court's grant of summary judgment in favor of defendants-appellees Rust-Oleum Service Company ("ROSC"), RPM International, Inc. ("RPM"), and Rust-Oleum Corporation ("Rust-Oleum") on appellants' claims under Ohio's Business Opportunity Plans Act ("BOPA"),[2] breach of contract, and related theories of liability. We affirm the trial court's findings.

## I. Summary

{¶2} RPM is a multinational holding company whose numerous subsidiaries include manufacturers of sealants, coatings, building materials, and specialty chemicals. Rust-Oleum is a direct subsidiary of nonparty RPM Consumer Holding Company, a direct subsidiary of RPM. Rust-Oleum manufactures specialty floor coating products, including the EpoxyShield floor coating products ("Products") involved in this case. ROSC was formed in 2005 as a direct subsidiary of nonparty Rust-Oleum International, L.L.C., which is a subsidiary of Rust-Oleum.

---

[1] The plaintiffs-appellants are as follows: Charles Brown, Jerry Garcia, Edward Grzeszczak, For Your Garage, L.L.C., Russell Heider, Russell's Painting Inc., David Klein, Old Town Painting, James Meinert, Meinert Plumbing, Scott Ouren, Roy Phaup, William Pfeiffer, Joan Pfeiffer, Qualified Interiors, Inc., Denis Schauner, Woodridge Maintenance, Inc., James Sheehy, Alpha-Triad Garage & Home Improvements, Ed Stribling, Alamo Improvement Services, L.L.C., Richard Thein, Adam Ward, S&B Wallcovering, Kurt Wolter, and Garage Pros.

[2] R.C. 1334.01, et seq.

**{¶3}** In 2004, The Home Depot ("Home Depot") and Rust-Oleum developed a pilot program for Home Depot's At Home Service Program ("HD Program"). ROSC was formed in 2005 to provide the Products and installation services for the HD Program. The parties later formalized the arrangement in a 2008 contract.

**{¶4}** Warner Industries, Inc. d.b.a. Stone-To-Foam ("Warner/STF") was incorporated in Ohio in 1996 to sell and install flooring and foam insulation to a national market. Warner/STF outsourced its product installation services to third-party independent contractors such as appellants. In 2008, due to fiscal difficulties, ROSC contracted with Warner/STF to provide installation of the Products for the HD Program. Shortly thereafter, Home Depot contracted directly with Warner/STF for installation of the Products.[3]

**{¶5}** The 15 appellants, small business owners, had dealer agreements with Warner/STF to sell, promote, and provide installation services for the Warner/STF's products. Thirteen of the 15 appellants entered into additional agreements with Warner/STF to perform installation services for the HD Program Products.

**{¶6}** In 2009, Home Depot decided to terminate the HD Program. The termination had a domino effect, as will be detailed later herein, and appellants' services were no longer needed. Appellants filed suit against RPM, Rust-Oleum, ROSC, Warner/STF, and Warner/STF owner Alan C. Warner. Home Depot is not a party to the

---

[3] ROSC was dissolved in 2009.

action. According to the record, several appellants entered into settlement agreements with Home Depot. The Warner/STF parties were dismissed under Civ.R. 41(A).

## II.     Facts

### A.     HD Program Pilot — Home Depot, Rust-Oleum, and ROSC

{¶7}   Rust-Oleum and Home Depot entered into an April 22, 2004 agreement to implement a pilot program to determine the potential viability of the HD Program. Under the pilot program, Rust-Oleum would supply the Products to Home Depot and provide installation services to Home Depot's customers. ROSC was formed in furtherance of this effort.

{¶8}   The term of the agreement was for six months, identified Rust-Oleum as an independent contractor, and specified that the relationship was not one of "franchisor-franchisee," or "partner, joint venture, fiduciary or co-employer." Each party disclaimed authority to bind the other. The agreement was executed by Ed Voorhees, vice-president of sales, and Rust-Oleum Brands Company.

### B. Program Agreements

#### 1. October 11, 2007 Home Depot and ROSC Service Provider Agreement

{¶9} The October 11, 2007 Home Depot Service Provider Agreement ("HD-ROSC SPA") formalized the pilot program. The agreement includes a "service provider classification" that indicates ROSC's role is to "sell, furnish and install." ROSC's employees, agents and subcontractors are to provide "services, products and/or materials" to Home Depot's customers. The term of the agreement is for one year and automatically renews. The agreement is terminable for convenience by either party at any time upon 90 days written notice.

{¶10} ROSC is an independent contractor under the agreement. ROSC's obligations include compliance with Home Depot's Service Provider Reference Guide. William Spaulding ("Spaulding") signed the agreement as vice-president and general manager of ROSC. Spaulding was also vice-president of consumer sales for Rust-Oleum who explained that he was authorized to sign for ROSC and Rust-Oleum.

#### 2. March 1, 2008[4] ROSC and Warner/STF Agreement

{¶11} On March 1, 2008, ROSC and Warner/STF entered into an agreement that references the service provider agreement between Home Depot and ROSC. ROSC agreed to "sell, furnish, and install services for garage floor coatings and installations" for "the [HD] Program." Warner/STF, an independent contractor pursuant to the

---

[4] The year is not listed in the agreement; however, an April 1, 2008 letter announcing "a new partnership" between Warner/STF and ROSC and deposition testimony served to establish the year.

agreement, agreed to provide installation of the Products through its independent contractors such as appellants. Warner/STF also agreed to be bound by the terms of the HD Program, attached as exhibits to the agreement. The agreement was terminable at-will by either party upon 90 days prior written notice. The agreement was also signed by Spaulding on behalf of ROSC.

### a. ROSC and Warner/STF Program Letter

{¶12} An April 1, 2008, a public announcement in the form of a "To Whom It May Concern" letter was issued by "Paul Kiminski, New Business Development, Rust-Oleum Service Company":

> Rust-Oleum Service Company has a national contract with The Home Depot to exclusively install Garage Floor Coatings. Rust-Oleum also offers two other programs through The Home Depot that will be offered to Stone to Foam [Warner/STF] through The Home Depot partnership: water-based concrete stains and garage storage [and] organization.

> Rust-Oleum's goal is to bring best in class products to Stone to Foam's dealers, offer training, and support in all areas. Rust-Oleum is looking forward to an excellent partnership with [Warner/STF].

### 3. June 1, 2008 Home Depot and Warner/STF Service Provider Agreement

{¶13} On June 1, 2008, Home Depot and Warner/STF entered into a service provider agreement for the HD Program ("HD-Warner/STF SPA"). Warner/STF agreed to provide installation services for the Products under the HD Program. Warner/STF was required to "source" the Products, arrange for pick up and delivery of the Products and materials to Home Depot's customer's home for installation at the beginning of the job, and maintain required records.

{¶14}   Warner/STF was listed as an independent contractor and the agreement is nonexclusive.  The agreement was  terminable at-will by either party upon 90 days prior written notice.

### 4.      Warner/STF and Appellants

{¶15}   Between 2006 and 2009, appellants entered into dealer contracts with Warner/STF to sell Warner/STF's products and provide related services.   In 2008 and 2009, 13 appellants also signed service agreements with Warner/STF that are specific to the HD Program installation services.

{¶16} As exemplars of the standard agreement terms employed by Warner/STF, we summarize the October 3, 2006 dealer contract between Warner/STF and appellant GarCo ("GarCo"), and the July 31, 2009 dealer and service contracts for appellant Old Town Painting.

### a.      GarCo Dealer Contract

{¶17}   The 2006 GarCo agreement established GarCo as a "Dealer" to provide services and products exclusively on behalf of Warner/STF in a specific market area. GarCo is required to meet a minimum purchase quota, purchase certain equipment from Warner/STF, pay fees for training, and pay a dealership fee to Warner/STF exceeding $60,000.   The contract is for a ten-year term.   Jerry Garcia testified to providing services under the dealer agreement for the HD Program, but did not sign a second agreement specifically relating to the HD Program.   Home Depot, the HD Program, Rust-Oleum, and ROSC are not referenced.

### b. Old Town Painting Contracts

### (I) Dealer Contract

{¶18} The Old Town Painting ("Old Time") dealer contract is similar in material respects to the GarCo contract. It establishes Old Town as a "Dealer" for Warner/STF to sell and promote Warner/STF's products and services. The relationship between the parties is "vendor and vendee." The contract includes a minimum quota for purchases of Warner/STF's products and services, has a ten-year term, includes a two-year noncompete clause, and references the scope and costs of training requirements, equipment costs, and payment of a dealership purchase fee of over $30,000. Home Depot, ROSC, and Rust-Oleum are not referenced.

### (ii) Contract for Services

{¶19} The contract for services, entered into the same date as the dealer contract, also identifies Old Town as a "Dealer." The contract states that Warner/STF "has entered into a contract" with Home Depot and Rust-Oleum[5] to "furnish some or all of the Services" listed in the contract. The services are described in Section I as: "sales and installation [of] products and services, floor coatings, garage cabinetry [and] modular garage flooring." Warner/STF "desires to contract such Services to a qualified Independent Dealer." The Dealer agrees to "perform such Services as a Dealer" for Warner/STF.

{¶20} In Section 5 of the contract, the Dealer indemnifies Warner/STF, Home

---

[5] While the contract references "Rust-Oleum," the March 1, 2008 agreement

Depot, and Rust-Oleum for mechanic's liens. Section 6 specifies that the Dealer "is an independent Dealer and not an agent, employee, partner, joint venture, or franchisee of [Warner/STF]." The termination clause provides that the contract automatically terminates if the Warner/STF "Agreement with Home Depot is terminated, regardless of the reason for such termination."

{¶21} "Workmanship is to be free from defects in accordance with Rust-Oleum/Home Depot requirements" as well as "the specific instructions of the retail contract." The Dealer promises to provide "sales and installation services" for the listed Home Depot store locations. The remaining contract provisions set forth the Dealer's obligations to Warner/STF, to meet Home Depot's service requirements. The attached product warranty sheet is issued by ROSC. Home Depot, Rust-Oleum, and ROSC are not parties to the contract.

### C. Program Termination

{¶22} On November 24, 2009, Home Depot issued a termination notice to Warner/STF, effective February 24, 2010. The termination had the domino effect of terminating the appellants' related agreements.

---

is between ROSC and Warner/STF.

### III. The Lawsuit

**{¶23}** A series of lawsuits was filed by the appellants between 2010 and 2013, asserting common causes of action:

*Sam's Painting LLC and Samuel Kearse v. Warner/STF Indus., Inc., Allen C. Warner/STF, and Rust-Oleum Servs. Co., Rust-Oleum Corp. and Paul Kiminski*, Cuyahoga C.P. No. CV-10-733355.

*Meinert Plumbing, James Meinert, David Klein Old Town Painting, and Ed Stribling v. Warner/STF Indus., Inc., Allen C. Warner/STF, Rust-Oleum Servs. Co., Rust-Oleum Corp., and RPM Internatl., Inc.*, Cuyahoga C.P. No. CV-11-750011.

*Alamo Plumbing and Edward Stribling v. Warner/STF Indus., Inc., Allen C. Warner/STF, Rust-Oleum Servs. Co., and Rust-Oleum Corp.*, Cuyahoga C.P. No. CV-11-751467.

*Alpha-Triad Garage and Home Improvement and James Sheehy v. Warner/STF Indus., Inc., Allen C. Warner/STF, Rust-Oleum Servs. Co. and Rust-Oleum Corp.*, Cuyahoga C.P. No. CV-11-752926.

*Dennis Schaumer v. Warner/STF Indus., Inc., RPM Internatl., Inc., and Rust-Oleum Corp.*, Cuyahoga C.P. No. CV-12-787434.

*Charles Brown III, Qualified Interiors and Roy Phaup v. Warner/STF Indus., Inc., RPM Internatl., Inc. and Rust-Oleum Corp.*, Cuyahoga C.P. No. CV-13-802261.

The cases were transferred to the commercial docket and consolidated under *Sam's Painting LLC,* Cuyahoga C.P. No. CV-10-733355. Appellants assert damages in excess of $100 million.

**{¶24}** Appellants contend that:

ROSC acted as agent of the RPM Group and it formed a joint venture between the RPM Group and Warner/STF. Based on these legal relationships, the RPM Group is liable under three distinct legal theories[:]

(1) because the Joint Venture breached Dealer Agreements with Appellants,

(2) because appellants were third-party beneficiaries of the March 2008 Contract, and

(3) because the Joint Venture did not provide appellants with disclosures required by Ohio's Business Opportunity Purchasers Protection Act, R.C. 1334.01, et seq. ("BOPA").

{¶25} Home Depot is not named as a defendant. Warner/STF and/or Allen C. Warner have failed to enter an appearance and, on August 5, 2016, appellants dismissed the action against them under Civ.R. 41(A).

**A.** **RPM and Rust-Oleum Motions for Summary Judgment**

{¶26} On February 22, 2016, appellees RPM and Rust-Oleum filed three motions for summary judgment. Separate motions were filed to simplify management of the issues for the trial court.

**1.** **Motion One — General Claims for All Appellants**

{¶27} The first motion defended claims common to all appellants. Appellees argued that appellants' breach of contract claims fails because there were no contracts between appellees and appellants. Appellees also argued that the claims are barred by the statute of frauds, and the negligence claims are barred by the economic loss doctrine. In addition, appellees asserted that appellants could not cite any duties owed by appellees to appellants that had been breached.

{¶28} Appellees refuted the existence of a joint venture and argued that, because appellants could not establish that any company served as the alter ego of Rust-Oleum or

RPM, there was no evidence that could be used to pierce the corporate veil. Appellees denied that appellants could demonstrate privity of contract and refuted appellants' third-party beneficiary claims.

### 2. Motion Two — BOPA Claims

{¶29}   The second motion focused on BOPA. Appellees asserted appellees did not meet BOPA's definition of a seller. Appellees  also argued that certain appellants were excluded by BOPA's statutory definitions because:

> Eleven appellants were engaged in ongoing businesses prior to purchasing their alleged Warner/STF business opportunity plans, rendering the Act inapplicable pursuant to an express statutory exception (R.C. 1334.12(J));

> Four appellants paid $50,000 or more for their alleged Warner/STF dealerships, so they do not meet the Act's definition of "business opportunity plan" (R.C. 1334.01(D)(2)); and

> Appellant Garcia/GarCo acquired his/its alleged Warner/STF dealership in 2006, nearly two years before getting involved in the Home Depot-related floor installation program at issue in this lawsuit (R.C. 1334.01(A)).

### 3. Motion Three — Lost Profits

{¶30} The third motion addressed lost profits.   Appellees asserted that appellants were barred from recovery due to:    (1) the contractual limitation of liability clause; (2) the speculative nature of the claim; and (3) the unavailability of lost profits under BOPA.

### B. Trial Court's Findings on Summary Judgment

{¶31}   The trial court entertained hearings on the motions for two days, including the submission of more than 500 exhibits.   Appellants decided to withdraw the tort

claims.

{¶32} On April 21, 2016, the trial court entered judgment for RPM and Rust-Oleum, finding that:

(1) there were no written contracts between appellants and RPM, Rust-Oleum or ROSC;[6]

(2) appellants failed to identify what terms were breached;

(3) appellants failed to establish third-party beneficiary status;

(4) the Warner/STF and ROSC contract identified Warner/STF as an independent contractor, and the terms did not establish an equal right of control or contain other indicators of a joint venture or agent-principal arrangement; and

(5) ROSC's status as a wholly owned subsidiary of Rust-Oleum with separate assets, payroll, and employees did not support piercing the corporate veil to impute liability to Rust-Oleum and RPM.

{¶33} Appellants filed the instant appeal.

## IV. Assignments of Error

{¶34} Appellant present three assignments of error for review:

I.   The trial court erred by granting RPM's motion for summary judgment.

II.  The trial court erred by granting Rust-Oleum's motion for summary judgment.

III. The trial court erred by granting ROSC's motion for summary judgment.

---

[6] The order also required that ROSC file a formal motion for summary judgment. ROSC filed its motion claiming entitlement based on the grant of summary judgment for RPM and Rust-Oleum on April 21, 2016, and the trial court's related analysis. The trial court granted ROSC's motion as a matter of law on August 3, 2016.

## V.    Standard of Review

{¶35}   We review a trial court's entry of summary judgment de novo using the same standard as the trial court.   *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).   Summary judgment may only be granted when the following are established:   (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, and who is entitled to have the evidence construed most strongly in its favor.   *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978); Civ.R. 56(C).

{¶36}   The party moving for summary judgment bears the initial burden of apprising the trial court of the basis of its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact on an essential element of the nonmoving party's claim.   *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 1996-Ohio-107, 662 N.E.2d 264.   "Once the moving party meets its burden, the burden shifts to the nonmoving party to set forth specific facts demonstrating a genuine issue of material fact exists."   *Willow Grove, Ltd. v. Olmsted Twp.*, 2015-Ohio-2702, 38 N.E.3d 1133, ¶ 14-15 (8th Dist.), citing *Dresher*.   "To satisfy this burden, the nonmoving party must submit evidentiary materials showing a genuine dispute over material facts."   *Willow Grove* at ¶ 15, citing *PNC Bank v. Bhandari*, 6th Dist. Lucas No. L-12-1335, 2013-Ohio-2477.

## VI.    Analysis and Law

### A. Positional Summaries

**{¶37}** As the trial court observed in its journal entry and order, "[i]t is undisputed that there are no written contracts between" appellants and RPM, Rust-Oleum, or ROSC. *See* Journal Entry No. 93811786, dated April 21, 2016, Cuyahoga C.P. No. CV-10-733355, p. 4. Warner/STF is no longer active. ROSC was dissolved in 2009 due to economic viability issues. Certain appellants have entered into settlement agreements with Home Depot. As a result of the foregoing, the only possible avenue of recovery is through the viable RPM entities.

**{¶38}** Appellants seek to circumvent the lack of contracts by arguing that ROSC served as the agent of RPM and Rust-Oleum and, through that agency arrangement, ROSC formed a joint venture with Warner/STF. In turn, the joint venture recruited appellants and subsequently breached their duties thereto, resulting in economic damages to the appellants.

### B. Discussion

**{¶39}** We combine the assigned errors for discussion and analysis for purposes of judicial economy.

**{¶40}** For the BOPA violations and arguments for breach of contract to survive, the privity of appellants must be established. Appellants argue that appellees are liable because "ROSC acted as agent of the RPM Group when it formed a Joint Venture between the RPM Group and Warner." Based on these alleged legal relationships, appellees proffer liability based on theories of: (1) agency; (2) joint venture; and (3)

third-party beneficiary. The BOPA violations were allegedly committed by the joint venture.

### 1. Agency and Piercing the Corporate Veil

**{¶41}** Piercing the corporate veil in Ohio "remains a 'rare exception,' to be applied only 'in the case of fraud or certain other exceptional circumstances.'" *Dombroski v. Wellpoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 17, quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).

> In *Belvedere [Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993)], this court established three-pronged test for courts to use when deciding whether to pierce the corporate veil, based on a test developed by the *United States Court of Appeals for the Sixth Circuit in Bucyrus-Erie Co. v. Gen. Prods. Corp.*, 643 F.2d 413, 418 (6th Cir.1981). *Belvedere* at 288-289. This test focuses on the extent of the shareholder's control of the corporation and whether the shareholder misused the control so as to commit specific egregious acts that injured the plaintiff:
>
> "The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id*. at paragraph three of the syllabus. All three prongs of the test must be met for piercing to occur.

*Dombroski* at ¶ 18; *State ex rel. Petro v. Pure Tech Sys*., 8th Dist. Cuyahoga No. 101447, 2015-Ohio-1638, ¶ 42.

**{¶42}** Otherwise upholding the *Belevedere* test, *Dombroski* prescribed a "limited expansion" to the second prong of *Belvedere:*

> [W]e hold that to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act. *Courts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct.* The first and third prongs of the *Belvedere* test are not affected by this ruling and must still be met for a piercing claim to succeed.

(Emphasis added*.*) *Id.* at ¶ 29.

**{¶43}** Thus, the current *Belvedere test*, as amended by *Dombrowski,* considers whether:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own,

> (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful conduct or an illegal act against the person seeking to disregard the corporate entity, and

> (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

**{¶44}** In Ohio, "proving a mere agency relationship between the parent and its subsidiary was insufficient" to pierce the corporate veil absent a showing of fraud or illegal activity. *Belvedere* at 274, citing *N. v. Higbee Co.,* 131 Ohio St. 507, 3 N.E.2d 391 (1936). Thus, we reject appellant's bare assertion that ROSC was formed by the RPM and Rust-Oleum to serve as their agent for purposes of piercing the veil.

**{¶45}** To meet the first prong of *Belvedere*,[7] appellants argue that RPM and Rust-Oleum, whom appellants label the "RPM Group," exerted total control over ROSC, by placing RPM Group executives to serve as officers and board members for ROSC's board. Appellants assert that Rust-Oleum and ROSC shared office space, the ROSC board of directors included officers of RPM and Rust-Oleum, and Rust-Oleum executives provided input into the HD Program operations.

**{¶46}** Evidence of total control "must be of a nature and a degree that renders the two corporations "'fundamentally indistinguishable.'" *Clinical Components v. Leffler Indus.*, 9th Dist. Wayne No. 95CA0085, 1997 Ohio App. LEXIS 199, at *8 (Jan. 22, 1997), quoting *Belvedere*, *supra*, at 288.

**{¶47}** Sharing of management, directors, or employees alone is not sufficient justification for piercing the corporate veil under *Belevedere*. "Ohio law permits one corporation to own all of the stock of another corporation and employ common officers and directors, as well as other personnel, without risking shareholder liability." *Bacoccini v. Ice Indus.*, 6th Dist. Lucas No. L-08-1401, 2009-Ohio-3800, ¶ 23, citing *Clinical Components* at * 8-9, *Fifth Third Bank v. Senvisky*, 8th Dist. Cuyahoga Nos. 100030 and 100571, 2014-Ohio-1233, ¶ 26.

**{¶48}** We do not find that the cited interactions of RPM, Rust-Oleum, and ROSC are sufficient to establish that ROSC had "no separate mind, will, or existence of its

---

[7] "The first element is a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable." *Belvedere* at 288.

own." *Belvedere* at 289. We agree with the trial court that the evidence demonstrates that ROSC "was a separate company, with its own assets, payroll and employees." Journal Entry No. 93811786, dated April 21, 2016, Cuyahoga C.P. No. CV-10-733355, p. 4.

{¶49} We also note that appellants' attempt to pierce the rather intricate corporate veil ignores the intermediate corporate entities. Appellants' suit does not include RPM Consumer Holding Company of which Rust-Oleum is a direct subsidiary or Rust-Oleum International, L.L.C. of which ROSC is a direct subsidiary. The structure reinforces appellees' position that they are separate legal entities. Thus, appellants seek to leapfrog integral entities to make its case. *See Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 363 (6th Cir.2008) (lack of direct ownership of stock a factor in determining alter ego).

### 2. Joint Venture

{¶50} This court has considered the elements required to demonstrate the presence of a joint venture:

> "A joint business adventure necessitates a joint contract, express or implied, between the joint adventurers to engage in a specific business enterprise, which contract does not, however, create the formal relationship of partnership. *Fitzhugh v. Thode*, 221 Iowa 533, 265 N. W. 893 [1936]; *Soulek v. Omaha*, 140 Neb. 151, 299 N.W. 368 (1941). *Ford v. McCue*, 163 Ohio St. 498, 502, 127 N.E.2d 209 (1955)."

*Meadows v. Air Craft Wheels, LLC*, 8th Dist. Cuyahoga No. 96782, 2012-Ohio-269, ¶ 22.

{¶51} To constitute a joint venture, the parties must express the "intent" that

"each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure." *Meadows* at ¶ 22, quoting *Ford v. McCue*, 163 Ohio St. 498, 504, 127 N.E.2d 209 (1955).

**{¶52}** Determination of intent is pivotal:

"Whether [the] parties have created, as between themselves, the relationship of joint adventure or some other relationship depends upon their actual intention, and such relationship arises only when they intend to associate themselves as joint adventurers. That intention, however, is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts. (Citations omitted)."

*Royal Appliance Mfg. Co. v. Fernengel*, 8th Dist. Cuyahoga No. 51268, 1987 Ohio App. LEXIS 8491, at *15 (Aug. 27, 1987), quoting *Ford* at 502.

**{¶53}** We again state that there are no direct contracts between appellants and appellees. Each of the contracts involved in the case clearly disclaims any objective to engage in a business relationship other than as arms-length, independent contractors, unequivocally evidencing the intent of the parties that each one is operating as a separate and distinct entity. *Id.*

### 3. Third-Party Beneficiary

**{¶54}** For a third-party to be an intended beneficiary under a contract in Ohio, the evidence must demonstrate that the contract was intended to directly benefit that party. "Generally, the parties' intention to benefit a third-party will be found in the language of the agreement." *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, 957 N.E.2d 3, ¶ 12, *Johnson v. U.S. Title Agency, Inc.*, 8th Dist.

Cuyahoga No. 103665, 2017-Ohio-2852, ¶ 59.

{¶55} There is no evidence in the record that the intent of the parties, and purpose of the existing contracts, was to benefit appellants. As the trial court astutely observed, appellants were, at best, incidental beneficiaries:

> "The mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Hill v. Sonitrol of Southwester Ohio Inc*., 36 Ohio St.3d 36, 521 N.E.2d 780, 785, quoting *Norfolk & Western Co. v. U.S.*, 641 F.2d 1201, 1208 (6th Cir. 1980)."

Journal Entry No. 93811786, dated April 21, 2016, Cuyahoga C.P. No. CV-10-733355, p. 4. *Cincinnati Ins. Co. v. Cleveland*, 8th Dist. Cuyahoga No. 92305, 2009-Ohio-4043, ¶ 29. "Indeed, the [p]laintiffs have not specifically identified what terms of any alleged contract were breached by ROSCO, Rust-Oleum, or RPM." Journal Entry No. 93811786, dated April 21, 2016, Cuyahoga C.P. No. CV-10-733355, p. 4.

### 4. BOPA

{¶56} Appellants' BOPA claims also fail. A business opportunity plan is an "agreement in which a purchaser obtains the right to offer, sell or distribute goods or services" under the conditions listed in the statute. R.C. 1334.01(D). R.C. 1334.03 sets forth the representations and practices that BOPA prohibits. *Saydell v. Geppetto's Pizza & Ribs Franchise Sys*., 100 Ohio App.3d 111, 127, 652 N.E.2d 218 (8th Dist.1994). A seller is a "person who sells or leases a business opportunity plan." R.C. 1334.01(A). A purchaser is "a person to whom a business opportunity plan is sold or leased." R.C. 1334.01(B).

**{¶57}** Appellants do not qualify as sellers, appellees do not qualify as purchasers, and there is no document between them constituting a business opportunity plan. At best, the dealer agreements between appellants and Warner/STF constituted business plans under BOPA, but there is no privity in this case legally linking appellants and appellees to create a legal duty.

**{¶58}** We find that the trial court did not err when it determined that, viewed in a light most favorable to appellants, there are no genuine material issues of disputed fact.

**{¶59}** The trial court's order is affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;
EILEEN T. GALLAGHER, J., CONCURS IN JUDGMENT ONLY